Emanuel V. GIUFFRE, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, Defendant.

No. 87 Civ. 8902 (KTD).

United States District Court,
S.D. New York.

Dec. 19, 1989.

Shneyer & Shen, New York City (Michael Shen, of counsel), for plaintiff.

Davidoff & Malito, New York City (Richard L. Steer, of counsel), Metropolitan Life Ins. Co., New York City, Raymond T. Mak, Associate Counsel, for defendant.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, United States Magistrate.

Plaintiff, Emanuel V. Giuffre ("Giuffre") has moved for leave to amend his complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure. Defendant, Metropolitan Life Insurance Company ("Metropolitan") opposes the motion for leave to amend and cross-moves to dismiss the amended claims pursuant to Rules 12(h) and 41(b) of the Federal Rules of Civil Procedure and to strike the jury demand. By Stipulation and Order of Judge Duffy dated September 12, 1989, the parties consented to have plaintiff's motion and defendant's cross-motion heard and decided by the undersigned.[1]

 Specifically, plaintiff's motion seeks (1) to add a claim for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (c), (d) (1984), based upon predicate acts of mail fraud, 18 U.S.C. § 1341 (1984), and extortion, New York State Penal Code, §§ 155.05(2)(e)(ii)(ix), 155.30, 155.35, 155.40 (1988) and (2) to reinstate a previously withdrawn age discrimination claim under New York State Human Rights Law, Executive Law § 296.[2] In addition, he requests a jury trial with respect to both the original and proposed amended causes of action.[3] Plaintiff's proposed amendment also seeks to add seven employees of Metropolitan, including senior executives and Board members, as additional defendants to the suit.[4]

Defendant asserts that the proposed amendment should be denied on futility grounds. The mandate of Rule 15(a), however, is that leave to amend shall be " 'freely given when justice so requires.' " 3 J. Moore, *Moore's Federal Practice* ¶ 15.08[2] (2d ed. 1988) (citations omitted). When a proposed complaint is challenged on the ground of futility some courts have held that the proposed complaint should be judged against a "frivolous" on its face standard, which is far more exacting than legal insufficiency. *Id.* at ¶ 15.08[4] n. 17. (citations omitted). Plaintiff's proposed amended complaint does not meet this frivolity standard. Accordingly, plaintiff's motion for leave to amend the complaint is granted. Defendant's motion to dismiss, however, is likewise granted as to both the RICO claim and the State Human Rights Law claim.

This case arises out of Giuffre's termination from Metropolitan on October 6, 1986. Giuffre is a fifty year old male who, beginning in 1960, was continuously employed by Metropolitan, during which time he received numerous awards for achieving high sales volume in his district. Following a ten month audit of his district beginning in 1985, Metropolitan determined that

---

1. To expedite the case, the parties also agreed that plaintiff's motion to amend, defendant's opposition thereto and defendant's cross-motion to dismiss would be submitted simultaneously and the complaint would be deemed amended where necessary for purposes of entertaining the cross-motion.

2. The original complaint asserted a claim for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (1985) and New York Executive Law § 296 (McKinney 1983). The state claim was later withdrawn without prejudice.

3. Plaintiff failed to request a jury trial in the original complaint.

4. Although the additional defendants are legally necessary for plaintiff to assert his RICO claim, throughout this opinion we refer to the defendant as Metropolitan, with the understanding that the other defendants are subsumed within that discussion.

Giuffre and members of his staff had violated company policies. On September 26, 1986, Metropolitan terminated eleven employees who had worked under Mr. Giuffre's direction. However, they were rehired on October 1, 1986 after the company determined that any improprieties in which these employees had engaged resulted from orders and directions from Mr. Giuffre. Mr. Giuffre was then terminated on October 6, 1986.

On December 15, 1987 Giuffre filed an ADEA complaint asserting that Metropolitan, needing to cut costs, had fired him because of his commanding salary, a product both of longevity with the company and sales productivity. He asserted as well that he was replaced by two younger and more junior employees whose combined salaries were less than Giuffre's. (Complaint ¶¶ 9, 10, 11). The proposed RICO amendment arises out of a new allegation that the policies which Giuffre allegedly violated and which led to his termination were part of a fraudulent scheme to defraud policy holders in which Metropolitan employees were forced to participate.

Before we go further, a brief description of the policies, which are central to the amended complaint, is necessary. Metropolitan has traditionally discouraged its salespersons from engaging in "replacement" or "piggybacking" sales—a selling technique where policyholders use "the cash value or equity accumulated in an older insurance policy to finance the purchase of a new insurance policy." (Defendant's Memorandum of Law, "Def. Mem." at 3). To reduce piggybacking, Metropolitan implemented, as early as 1982, the "Rewritten Business Rule" whereby first year commissions were restricted on policies sold by this method. (See Exhibit D to Defendant's Notice of Cross Motion, "Cross-motion"). Furthermore, in order to determine whether piggybacking was used as a method of selling, Metropolitan instituted the "FIP System" "whereby computers would identify transactions that ap-

peared to involve the use of equity from an existing Metropolitan Life policy for the purchase of new insurance...." (Def. Mem. at 4). The company embarked on a program to maintain low FIP ratios, i.e., the ratio of piggybacked sales to other sales, among its salespersons. Periodic audits were conducted to monitor sales transactions. In addition, in 1985, the Company determined that "where there [was] evidence [5] that a Sales Representative, *as a method of selling* (and not based solely on the FIP ratio), ha[d] been using present policy values to finance new business, a recommendation [might] be made to terminate that Sales Representative." ("Piggybacking/Replacement" Guided Conference Outline, annexed as Exhibit C to Cross-motion).

On the other hand, although Metropolitan wished to reduce FIP ratios and prevent the rollover of funds from an old to new policies, another policy required that customers who did roll over funds to purchase new Universal Life policies were excused from paying administrative costs, known as load charges, that amounted to nine percent of the first year's premium.

Taken together, these policies placed sales representatives in a difficult position. While policy holders saved load charges by rolling over funds, a sales representative received reduced commissions on rollover sales and could be terminated if such sales constituted a significant portion of total sales. Plaintiff asserts that these rules were instituted when the "defendants became very concerned about the outflow of money from old insurance policies to instruments of savings and investments with much higher yields." (Amended Complaint, "Am. Complaint" ¶ 18). Furthermore, he maintains that this situation "induced salespersons to make false material representations and withhold information so as to deceive policy holders into holding policies longer than necessary and paying more premiums than needed and to conceal the possible 9% load waiver on universal

---

**5.** Data revealing that 15% or more of a repre- sentative's sales were the result of piggybacking

life insurance ..." [6] (Am. Complaint ¶ 29). Defendant, on the other hand, has little difficulty reconciling these policies. Noting that the "rules regarding these transactions are very clear," (Def. Mem. at 6), defendant explains that company policy required termination where the sales representative used this type of transaction *"as a method of selling,"* id. (emphasis in original), whereas individual sales based on this practice simply resulted in restricted commissions and high FIP ratios.

Plaintiff alleges that these policies were part of a fraudulent scheme constituting a "pattern of racketeering activity," 18 U.S.C. § 1961(5) (1984),[7] with a two-fold purpose to "defraud Metropolitan's own policy holders as well as to decrease the commissions of its own salespersons...." (Am. Complaint ¶ 30). It is further alleged that the predicate acts constituting the pattern of racketeering activity involved mail fraud and extortion. Plaintiff claims that the scheme was executed by use of the United States Mail through which the various policy directives were sent from Metropolitan Headquarters to regional offices. Second, he alleges that Metropolitan engaged in two separate acts of extortion. Initially, it threatened employees with termination unless they participated in the fraudulent scheme by deceiving Metropolitan customers. And then Metropolitan again extorted those employees it terminated by conditioning their reemployment upon a coerced admission that Mr. Giuffre was responsible for their transgressions. This entire scenario was necessary, plaintiff implies, in order to achieve Metropolitan's final objective—using the fraudulent scheme as a method by which Metropolitan could terminate older employees, specifically Giuffre, on the pretext of a policy viola-

tion and thus shield itself from age discrimination liability.

Reading these allegations together then, plaintiff's complaint seems to allege as follows: Giuffre and salespersons on his staff were forced to engage in fraudulent company practices on threat of termination; the staff members were then terminated for engaging in these practices which resulted in their customers being overcharged with 9% fees; these staff members were then again extorted and forced to "falsely accuse Mr. Giuffre of condoning and training his employees to circumvent Metropolitan Life policies", (Am. Complaint ¶ 34),—all so that defendants could terminate Mr. Giuffre on the pretense of company policy violations.

## DISCUSSION

Because this is a motion to dismiss,[8] the facts, as stated in the complaint, must be taken as true and all reasonable inferences resolved in favor of the plaintiff. *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). Legal conclusions or opinions, however, need not be given a presumption of truthfulness. 2A J. Moore, *Moore's Federal Practice,* ¶ 12.07[2.–5] (2d ed. 1989); *Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck,* 463 F.2d 620, *cert. denied* 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973).

### The RICO Claim

Mr. Giuffre's standing to sue under the RICO statute is based upon 18 U.S.C. § 1964(c) (1984) which states that an individual may sue if he is "injured in his business or property *by reason of* a violation of § 1962 of this chapter...." (emphasis added).[9] Thus, in order to have stand-

---

constituted such evidence.

**6.** Plaintiff fails to make explicit whether he engaged in the allegedly fraudulent scheme. However, his reliance on certain arguments implicitly acknowledges or admits his participation.

**7.** 18 U.S.C. § 1961(5) (1984) defines "pattern of racketeering activity" as requiring at least two acts of racketeering activity.

**8.** Although defendant has cross-moved pursuant to rules 41(b) and 12(h), we will apply the standards for dismissal under Fed.R.Civ.P. 12(b)(6).

**9.** 18 U.S.C. § 1962 (1984) states in relevant part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a princi-

ing to sue under § 1964(c) the plaintiff must show (1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury. *See Haroco v. American Bank and Trust Co.* 747 F.2d 384, 398 (7th Cir.1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

■ In the leading case addressing the "by reason of" language, *Sedima, S.P.R.L v. Imprex Co.*, the Supreme Court held that damages caused directly by the predicate acts of a RICO violation are recoverable, but stated that "a plaintiff only has standing [under § 1964(c)] if, and may recover only to the extent that, he has been injured in his business or property by the conduct constituting the violation...." 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Citing *Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d at 398, the Supreme Court went on to state that " '[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct,' " *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285, but only to anyone whose injuries were caused "by reason of" a violation of section 1962. "[T]his 'by reason of' language ... imposes a proximate cause requirement on plaintiffs." *Haroco,* 747 F.2d at 398; *Sperber v. Boesky,* 849 F.2d 60, 63 (2d Cir.1988); *Cullom v. Hibernia Nat'l Bank,* 859 F.2d 1211, 1214 (5th Cir. 1988). That is, "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of any enterprise." *Sedima,*

pal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce....

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

473 U.S. at 497, 105 S.Ct. at 3285. The critical question then is to determine whether plaintiff has alleged the requisite causal connection between the predicate acts of mail fraud and extortion and the loss of his job.

Mr. Giuffre's injuries were not caused directly by defendant's alleged RICO violations.[10] Assuming, as we must, the fraudulent scheme existed, the scheme was directed to Metropolitan policy holders. They were the persons to whom sales representatives allegedly lied and who were prevented from using the equity in their old life insurance policies to purchase new policies or charged with excessive administrative fees. Neither Mr. Giuffre's decision to participate in the alleged fraud nor his subsequent termination flowed directly from these actions. Giuffre maintains, however, that his termination "was not merely a byproduct ... of a long chain of events set in motion by defendant's racketeering activity", (Plaintiff's Mem. at 6) but "precisely the outcome intended by defendants." *Id.* To accept the truth of this allegation would be to give credence to what is simply an incredulous and unsupported assertion that Metropolitan established a nationwide fraudulent scheme for the sole purpose of firing Mr. Giuffre and replacing him with younger, lower-salaried employees. We are under no obligation to do so. *See Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981) *aff'd* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (conclusory allegation of a conspiracy without any supporting facts insufficient to withstand motion to dismiss).[11]

**10.** At various points in his papers, plaintiff, in fact admits that he "does not allege that his termination resulted from defendant's fraudulent scheme per se," (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss "Plaintiff's Mem." at 7) but "was the immediate objective of another connected but distinct predicate act defendant's extortion of other employees." Id.

**11.** Perhaps recognizing that this argument is incredible on its face, plaintiff also attempts to establish a direct injury by alleging that the FIP rule was intended to diminish sales commissions to MLIC salespersons. (Am. Complaint ¶ 30). Even if true, a company's decision to

A similar situation arose in *Burdick v. American Express Co.*, 677 F.Supp. 228 (S.D.N.Y.1988), *aff'd*, 865 F.2d 527 (2d Cir. 1989), where an employee claimed that he was fired in retaliation for his complaints about his employer's alleged RICO violations and in order for his employer to acquire his valuable client base. Holding that such "whistleblowers" lacked standing to bring a RICO claim this court stated:

> The predicate acts that plaintiff alleges Shearson engaged in were frauds directed at Shearson customers, not at the plaintiff. It was the customers whose interest and dividends were allegedly withheld and it was the customers who were allegedly induced into transactions for the sole purpose of generating commissions. Plaintiff's alleged injuries— his loss of his job and of his client base— did not flow directly from the predicate acts. Plaintiff was not injured 'by reason of' Shearson's alleged fraud and therefore has no standing to bring a civil RICO suit.

*Id.* at 230; *accord Pujol v. Shearson/Am. Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir. 1987). In *Hecht v. Commerce Clearing House*, 713 F.Supp. 72 (S.D.N.Y.1989) this court expanded *Burdick*, holding that employee termination resulting from the act of "not participating" in fraudulent activities encouraged by an employer also did not confer standing on that party to sue for RICO violations. Surely, if whistleblowers and non-participants who suffer job loss have no standing to sue, an individual like Mr. Giuffre, who neither claims to be a whistleblower, nor maintains that he did not participate in the fraud, should not have the opportunity to assert damages through the RICO statute. *See Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir. 1987) (employer's firing of employee for reporting illegal scheme to superiors was wrong but did not violate RICO); *O'Malley v. O'Neill*, 887 F.2d 1557 (11th Cir.1989)

(employee fired for failure to participate in fraud lacked standing to bring RICO action); *Cullom v. Hibernia Nat'l Bank*, 859 F.2d 1211 (5th Cir.1988) (employee discharged for refusal to participate in RICO mail fraud scheme not injured "by reason of" the commission of the predicate acts).

Having determined that Giuffre's termination was not the direct result of defendant's alleged RICO violations, we turn now to Mr. Giuffre's claim that his firing was an indirect result proximately caused by Metropolitan's alleged scheme. Some courts have held that indirect injury is sufficient to confer standing. *Terre du Lac Ass'n., v. Terre du Lac, Inc.*, 772 F.2d 467, 473 (8th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986); *Komm v. McFliker*, 662 F.Supp. 924, 928 (W.D.Mo.1987); *Sperber v. Boesky*, 849 F.2d 60 (2d Cir.1988) (indirect injuries, in addition to direct injuries, must be proximately caused). Addressing this issue in the whistleblower context, however, *Hecht* concluded that the Second Circuit's broad reading of the RICO statute in *Sperber* did not extend so far as to "expand the causal connection requirement to include the indirect injuries suffered by 'whistleblowers' or 'nonparticipants.'" *Hecht v. Commerce Clearing House*, 713 F.Supp. at 76. Just as this court's conclusion in *Hecht* was based on the fact that the plaintiff was not the target of the racketeering enterprise, we are unable to conclude that Mr. Giuffre's indirect injuries were proximately caused by the alleged RICO violations.

Having failed to establish a causal relationship between the fraudulent scheme and his termination, Mr. Giuffre artfully attempts to distinguish his case from the facts in *Burdick* or *Hecht* by alleging that his termination was the "immediate objective" (Plaintiff's Mem. at 7), not of the scheme itself, but of both predicate acts of extortion.[12] We find it unnec-

---

restructure its commission percentages is not prohibited by 18 U.S.C. § 1962(a).

**12.** Plaintiff contends that "to enforce their FIP Program, defendants singled out Mr. Giuffre for termination because of his monetary success, age and wide reputation." (Plaintiff's Mem. at

14–15). Furthermore, he states that he was the "sole target of defendant's extortionary act." *Id.* at 6.

In *Burdick*, the Second Circuit rejected the plaintiff's claims that he was discharged as an integral part of the illegal scheme, noting that

essary to address the legal issue of whether injury caused by one predicate act is sufficient to confer standing, as plaintiff contends, because plaintiff has failed to properly plead extortion under New York Penal Law Sec. 155.05(1) and (2)(e) (1988). That statute states in relevant part:

1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.
2. Larceny includes a wrongful taking ... committed

(e) By extortion

A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will....

The acts of extortion are alleged to have occurred when Metropolitan (a) threatened Giuffre and his staff with termination if more than 15 percent of his sales were replacement sales, thus forcing him to participate in the fraudulent scheme and (b) fired eleven employees on Mr. Giuffre's staff and conditioned their reemployment on their agreement to "falsely accuse Mr. Giuffre of condoning and training his employees to circumvent Metropolitan Life policies." (Am. Complaint ¶¶ 34, 35).

The statute states that larceny is committed when one "wrongfully takes ... such property from an owner thereof." New York Penal Law § 155.05(1) (1988). Although the statute "does not require that the [extortion] be leveled directly at the owner," 32 N.Y.Jur.2d. Criminal Law § 716 (1983), an exception has been made only where there exists a "special relationship" between the person to whom the extortionate conduct is directed and the owner of the property. *People v. Slocum,* 97 Misc.2d 728, 412 N.Y.S.2d 321, 323 (1979) (threat to director of State Republican Committee to acquire state job constitutes extortion because special relationship ex-

ists between party committees and government with respect to public jobs). Such a special relationship exists where the non-owner can "reasonably be considered in a position to effectuate the nefarious demand if he is willing." *Id.*

No such "special relationship" existed between Giuffre and Metropolitan's policy holders. Giuffre could not deliver the policy holder's money to Metropolitan. At worst, Giuffre could only either fail to inform Metropolitan's customers as to the administrative charge savings produced by rolling over policies to purchase newer policies or "falsely inform policyholders that their equity was unavailable to them, thereby preventing policyholders from using that equity." (Plaintiff's Mem. at 10). As policy holders retained the ultimate choice and responsibility for any decision as to their life insurance, Metropolitan's. alleged extortion of Giuffre could not have resulted in Giuffre's ability to "deliver such property" to Metropolitan. Likewise, threatening the sales staff with termination unless they participated in framing Mr. Giuffre does not constitute extortion because Metropolitan did not by its actions, obtain or attempt to obtain any "property" within the meaning of New York Penal Law § 155.00(1) (1988). Where an employee has no property right to be retained as an employee, there can be no property to unlawfully injure. *People v. Cuddihy,* 151 Misc. 318, 271 N.Y.S. 450 (1934), *aff'd,* 243 App.Div. 694, 277 N.Y.S. 960 (1st Dept. 1935). This is especially true in a situation where an employee has been terminated for violating company policy. *See generally* 52 N.Y.Jur.2d. Employment Relations § 62–85 (1986); *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987).

Finally, Metropolitan's decision to reduce commissions on piggybacked sales cannot be equated in any manner with "the taking of property" belonging to another. Sales representatives have no property right in their precise· commission earnings and a company is surely free to establish selling

there was no distinction between "preventive" and "retaliatory" discharge in this context. *Bur-*

*dick v. American Express Co.,* 865 F.2d 527 (2d Cir.1989).

guidelines and priorities even where such decisions may affect earnings potential.

Having demonstrated that Mr. Giuffre has suffered neither direct nor indirect injury resulting from the alleged RICO violations, he does not have standing to sue under 18 U.S.C. § 1964(c). Accordingly, we dismiss his RICO claims in the amended complaint.

*The State Human Rights Law Claim.*

■ Plaintiff's amended age discrimination complaint under the State Human Rights Law presents an issue which has been the subject of recent attention in this jurisdiction. Notwithstanding that the law on this matter is somewhat in flux, we conclude that defendant's motion to dismiss should be granted.

The issue turns on a curious anomaly created by the combined effect of New York's age discrimination law and the federal ADEA with respect to an individual choosing to sue under both provisions. Section § 297(9) of the State Human Rights Law requires that an aggrieved party suing under state law elect either an administrative or judicial remedy for alleged discrimination. New York Executive Law § 297(9) (McKinney 1983). To file a claim in federal court under the ADEA, however, a plaintiff is required to first file an EEOC complaint. 29 U.S.C. § 626(d). Under the EEOC deferral provision, 29 C.F.R. § 1601.13, when a state, such as New York, has its own anti-discrimination statute, a state administrative proceeding must be commenced in accordance with that state's laws before a federal action is brought. Thus, "the combined effect of ADEA and the Human Rights Law in New York is effectively to preclude the filing in federal court of state age discrimination claims pendent to a federal ADEA action." *Keeley v. Citibank, N.A.,* 711 F.Supp. 157 (S.D.N.Y.1989). "Although the result has been called anomalous, it is in fact mandated by the statutory structure and is justified by principals of federalism and comity." *Id.* at 161.

To alleviate the harshness of this situation, some cases have carved out an exception to New York's election of remedies rule when the administrative complaint is forwarded to the state agency by the EEOC pursuant to 29 C.F.R. § 1601.13, rather than by the plaintiff himself. *Selbst v. Touche Ross & Co.* 587 F.Supp. 1015 (S.D.N.Y.1984); *People v. Holiday Inns, Inc.,* 656 F.Supp. 675 (W.D.N.Y.1984); *Kaczor v. City of Buffalo,* 657 F.Supp. 441 (W.D.N.Y.1987); *O'Brien v. King World Productions Inc.,* 669 F.Supp. 639, 641–42 (S.D.N.Y.1987).

Factually this is the situation in the case before us. Adhering to the ADEA requirement, Mr. Giuffre filed an EEOC claim prior to filing his federal claim. The EEOC then filed the claim with the State Human Rights Commission. Plaintiff maintains that he fits squarely into the exceptions carved out by *Selbst, Holiday Inns* and *Kaczor,* and that therefore he is entitled to pursue a state judicial remedy despite the fact that his claim has taken the administrative path.

Defendant, however contests the validity of this exception, relying on a recent New York State appellate decision, *Scott v. Carter–Wallace Inc.,* 147 A.D.2d 33, 541 N.Y. S.2d 780 (1st Dept.1989), which rejected any distinction between a plaintiff who files directly with the administrative agency and one who files with the EEOC which then defers to the administrative agency. Noting that "legal rights should not depend on choices unwittingly made," *id.* at 783, it held:

> By statute, a State court action is barred by the filing of a complaint with the State Division, and it should make no difference whether that filing is made by the grievant himself or by the EEOC for him. Put otherwise, a grievant who files with the EEOC effectively elects, whether he realizes it or not, a federal judicial forum, and it is to that forum that the grievant should look for his remedies, including any state law remedies provided by the Human Rights Law....
> We can only say that we think it anomalous and unfair that access to state court should be available to a grievant who initially files with the EEOC but not to one who initially files with the State Divi-

sion. If this means that by filing with the EEOC a grievant forfeits the right to have a Human Rights law Claim judicially redressed, the grievant who files with the State Division is no better off. Should the federal courts, in view of this decision, make it their policy to refuse pendent jurisdiction over Human Rights Law claims, then the EEOC filer, just like a State Division filer, would simply be relegated to the State Division for redress of his Human Rights Law claim. *Id.* Moreover, the *Scott* decision expressly overruled *Rodriguez v. B. Altman & Co.,* N.Y.L.J., May 7, 1984, p. 14, col. 2 [Sup.Ct. N.Y. Co., Wallach, J.], the very case upon which federal courts in this jurisdiction have relied in fashioning the EEOC filing exceptions.

Plaintiff criticizes the reasoning in *Scott* relying upon dicta in *Selbst v. Touche Ross & Co.,* 587 F.Supp. at 1017, praising the reasoning in *Rodriguez* as well as dicta in *Kaczor v. City of Buffalo* that "the plain language of § 297(9) makes the bar to court applicable only when the plaintiff himself files with the state agency and not when a third party files on his behalf." 657 F.Supp. at 447. Further, plaintiff criticizes *Scott's* failure to rely on legislative history to construe the statute.

Of course, while *Scott* precludes a § 297(9) claim from being brought in state court, the federal court is not bound by this decision. District courts, however, have exercised their discretion to dismiss pendent state law claims either because "they would require exploration of uncharted areas of state law or state issues predominated...." *See* citations in 3A J. Moore, *Moore's Federal Practice* ¶ 18.07, n. 45, 46 (2d ed. 1989). Furthermore, in a recent case where the plaintiff, rather than the EEOC, had personally filed with the State Division of Human Rights Judge Edelstein noted in a footnote that

> [T]his court disagrees with the arbitrary distinction drawn by *Kaczor* and *Holiday Inns.* According to that rationale,

whether a pro se plaintiff may bring a state action in federal court is dictated by the fortuity of which agency receives his or her complaint first.... On the other hand a plaintiff represented by counsel would have the opportunity to circumvent the apparent intent of the state and federal statutes. There seems to be no justification for such a result.

*Keeley v. Citibank, N.A.,* 711 F.Supp. at 161, n. 3 (citation omitted). It appears that the winds of change are blowing on this issue.

Furthermore, in addition to the holding in *Scott* and Judge Edelstein's footnote in *Keeley,* consistency also demands that this court refuse to exercise pendent jurisdiction. It is self evident that federal courts may not exercise pendent jurisdiction absent a cognizable state claim. Because under *Scott* a claimant in plaintiff's situation has no state claim, this Court cannot exercise pendent jurisdiction.

Finally, even absent *Scott,* there are sound policy grounds articulated in two recent cases in this Circuit on which to reject pendent jurisdiction. In *Burger v. Health Insurance Plan of Greater New York,* 684 F.Supp. 46, 50 n. 4 (S.D.N.Y. 1988), this court refused to exercise pendent jurisdiction fearing potential jury confusion on the damages issue since although mental anguish damages are punishable under state law, such damages are irrelevant to ADEA violations. Similarly, in *Realmuto v. Yellow Freight System, Inc.,* 712 F.Supp. 287 (E.D.N.Y.1989),[13] the court refused to allow pendent jurisdiction concluding that a policy permitting plaintiffs to recover compensatory damages by pursuing both an ADEA and state claim would discourage plaintiffs from settling during the EEOC conciliation process. On the basis of these sound policy considerations, in addition to the reasoning articulated in *Scott,* we grant defendant's motion to dismiss the State Human Rights claim.

---

13. Judge Wexler noted in his opinion that the district courts are split on the issue of exercising pendent jurisdiction and the Second Circuit has not ruled on whether a plaintiff may commence an ADEA action and age discrimination claim based on New York Human Rights Law in federal court.

80

*The Jury Demand*

Having dismissed plaintiff's amended complaint as to both the RICO and State Human Rights Law claim, plaintiff's demand for a jury trial with respect to these claims must likewise be denied.

Plaintiff also attempts to add a jury claim with respect to his original complaint. Rule 38 Fed.R.Civ.P. states in relevant part:

> (b) Demand. Any party may demand a trial by jury ... by serving upon the other parties a demand therefor in writing ... not later than 10 days after the service of the last pleading directed to such issue....

The last pleading in this case was served on January 29, 1988 and plaintiff's amended complaint requesting a jury trial was served on June 14, 1989, well in excess of the 10 day limitation. Pursuant to Rule 38(d) Fed.R.Civ.P. a party who fails to serve a jury demand as required by Rule 38 waives the right to a jury trial.

IT IS SO ORDERED.