**Leo HAVILAND, Plaintiff,**

v.

**J. ARON & CO., Defendant.**

**No. 89 Civ. 8463 (LBS).**

United States District Court, S.D. New York.

June 10, 1992.

As Amended June 15, 1992.

Jay Goldberg (Jay Goldberg, of counsel), Judd Burstein, P.C. (Judd Burstein, of counsel), New York City, for plaintiff.

Sullivan & Cromwell, New York City (Gandolfo V. Diblasi, Theodore O. Rogers, Jr., and Thomas J. Witt, of counsel), for defendant.

## OPINION

SAND, District Judge.

This Opinion, addressing defendant J. Aron's motion to dismiss, is not our first in

this litigation. Plaintiff Leo Haviland commenced this action in December 1989, initially naming his former employer, Goldman, Sachs & Co. ("Goldman"), and its affiliate, J. Aron & Company ("Aron") as defendants. Defendants filed a motion to stay this proceeding pending arbitration before the New York Stock Exchange, which we granted as to Goldman but denied as to Aron. *See Haviland v. Goldman Sachs & Co.*, 736 F.Supp. 507 (S.D.N.Y.1990), *aff'd*, 947 F.2d 601 (2d Cir.1991), *cert. denied*, ——— U.S. ———, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). Plaintiff subsequently discontinued this action against Goldman, *see* Stipulation and Order dated January 7, 1992, so Aron is the only remaining defendant.

In the motion currently before this Court, Aron argues, *inter alia,* that Haviland's claims pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO") Act should be dismissed because Haviland lacks standing to assert them.[1] In the event that we dismiss the RICO claims, Aron also contends that we should dismiss Haviland's claim of common law fraud for lack of federal jurisdiction. For the reasons that follow, we agree that Haviland lacks standing to assert the RICO claims and dismiss the complaint in its entirety.

## I. BACKGROUND

Although the facts underlying this action have been set forth in prior opinions, we restate them because they are so essential to our discussion of RICO standing. Leo Haviland joined Goldman in 1979 and served as a vice president in Goldman's Energy Futures and Options Group ("Energy Futures") from April 1984 until the termination of his employment in February 1989. In that role, Haviland earned commissions for Goldman by trading energy futures and options on energy futures on behalf of large refining and marketing firms, energy producers, and oil trading companies. According to the complaint, Haviland's efforts brought him "extensive,

exclusive, and confidential knowledge about the needs and plans of important players in the energy market." ¶ 2.

Aron is a partnership consisting of all Goldman partners through which the partners invest their own capital in various commodities and in foreign exchange. In 1984, Aron began trading as a principal in the energy futures, options, forwards and physical delivery markets. According to Haviland, Aron's entry into the energy market created a potential conflict of interest in that the confidential information he acquired from his clients about their future trading plans could be of enormous value to Aron. For example, if Aron knew that one of Haviland's clients intended to purchase a substantial amount of oil, Aron could attempt to enter the market before Haviland's client and later sell the oil at a profit.

Recognizing this potential conflict and convinced that "no significant client would have dealt with [Haviland] if they believed that [he] would disclose that client's plans ... to another participant in the marketplace," Haviland expressed "grave concerns" to Goldman about the need to preserve his clients' confidentiality. ¶ 17. According to the complaint, Goldman responded to his concerns by making explicit, but false, promises that it would erect a "Chinese wall" between Energy Futures and Aron to prevent the disclosure of any confidential information to Aron. These misrepresentations, which were allegedly designed to deceive Haviland into thinking he could remain at Goldman and yet continue to act ethically, occurred from April 1984 until the spring of 1987 and were made to both Haviland and his clients.

Although the above statements were allegedly intended to defraud Haviland into remaining at Goldman, Goldman and Aron later shifted tactics. The complaint further asserts that from July 1987 through January 1989, Goldman and Aron attempted to extort Haviland into divulging confidential

---

**1.** Aron also moved to dismiss the RICO claims on the grounds that Haviland had failed to satisfy the "continuity" requirement and that the RICO statute was unconstitutionally vague. Be-

cause we find the standing issue dispositive, however, we need not address these alternative grounds for dismissal.

client information. Specifically, Haviland asserts that on eight occasions, he was informed that increased cooperation between Energy Futures and Aron was necessary, and that his prospects and compensation at Goldman would be tied to such cooperation. Haviland claims that because he refused to provide the requested information, he was denied appropriate salary increases and ultimately fired in February 1989.

## II. DISCUSSION

### A. The Standard of Review

In reviewing Aron's motion to dismiss, this Court is required to accept the allegations in the complaint as true and to construe them in the light most favorable to Haviland. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); Dacey v. New York County Lawyers Ass'n, 423 F.2d 188, 191 (2d Cir.1969), cert. denied, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970). The complaint will be dismissed only if Haviland can prove no set of facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Goldman v. Belden, 754 F.2d 1059, 1065 (2d Cir.1985). Despite the liberality of this standard, only the "well-pleaded factual allegations" in the complaint must be accepted as true, Papasan v. Allain, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986), and we need not credit "baldly conclusory" statements that are unsupported by any factual basis. Duncan v. AT & T Communications, 668 F.Supp. 232, 234 (S.D.N.Y.1987).

### B. Haviland's Claims for Relief

Haviland's complaint contains three causes of action. First, Haviland asserts a claim under 18 U.S.C. § 1962(c) of the RICO Act, which prohibits any person from conducting the affairs of an enterprise through a pattern of racketeering activity.

Second, Haviland charges Aron with having conspired with Goldman to commit that substantive RICO offense in violation of 18 U.S.C. § 1962(d). Finally, Haviland asserts a claim of common law fraud.

In fleshing out his RICO claims, Haviland states that Goldman and Aron formed an "association in fact" enterprise through which they engaged in a "pattern of racketeering activity" that was directed at him. The complaint divides the pattern of racketeering activity into two separate subschemes, each involving a different type of predicate conduct. In describing the first scheme, Haviland focuses on the alleged plan to defraud him into remaining at Goldman, and asserts that various misrepresentations made to Goldman's customers from April 1984 to the spring of 1987 amount to "thousands of violations" of the mail fraud statute, 18 U.S.C. § 1341 (Supp.1992), and a more limited number of violations of the wire fraud statute, 18 U.S.C. § 1343 (Supp. 1992). In describing the second scheme, Haviland sets forth the alleged efforts to extort him into divulging confidential client information that occurred from July 1987 until his termination in February 1989. Haviland contends that these threats, combined with an allegedly inappropriate raise in 1987, a salary reduction in 1988, and his ultimate discharge in 1989, constituted attempted extortion in violation of the Hobbs Act.[2]

### C. Standing Under Section 1964(c) and the Relevant Caselaw

In urging this Court to dismiss the RICO causes of action, Aron does not focus on the sufficiency of the predicate acts themselves. Instead, Aron argues that Haviland's claim is essentially one for "wrongful termination," and that courts in this Circuit and elsewhere have consistently held that the injury flowing from a retaliatory firing is insufficient to confer standing under RICO.

---

2. The Hobbs Act, 18 U.S.C. § 1951 (1984), punishes any person who:

> obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section.

■ The right to maintain a private RICO action extends only to those "person[s] injured in [their] business or property *by reason of* a violation of section 1962 of this chapter...." 18 U.S.C. § 1964(c) (emphasis added). Although the meaning of the "by reason of" language is not altogether intuitive, the Supreme Court has made clear that a " 'defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct.' " *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (citation omitted). Instead, a "plaintiff only has standing [under 1964(c) ] if, and may recover only to the extent that, he has been injured in his business or property by the conduct constituting the violation...." *Id.* Thus, in order to have standing to sue under RICO, the alleged injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts, and the RICO pattern or acts must *proximately* cause the alleged injury. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990); *see also Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (right to sue under RICO requires a direct, proximate relation between the injury asserted and the injurious conduct alleged). The RICO pattern or acts proximately cause a plaintiff's injury "if they are a substantial factor in the sequence of responsible causation and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht*, 897 F.2d at 23–24 (citations omitted).

Courts in this Circuit have had numerous opportunities to apply these generalized principles to employees' specific claims that they were fired or otherwise penalized for disclosing or refusing to participate in the allegedly unlawful actions of their employers. In each case, the courts have concluded that any injury flowing from the employer's retaliatory conduct was not sufficiently proximate to the alleged RICO violations to confer standing on the employee. *See, e.g., Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir.1990) (no standing for employee alleging loss of employment and commissions resulting from his refusal to cooperate in employer's mail and wire fraud scheme); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634 (2d Cir.1989) (no standing for employees claiming harassment in retaliation for blowing the whistle on employer's violations of the Energy Reorganization Act); *Burdick v. American Express Co.*, 865 F.2d 527 (2d Cir.1989) (per curiam) (no standing for stockbroker who was allegedly fired and lost his client base for complaining about his employer's acts of mail and securities fraud); *Miller v. Helmsley*, 745 F.Supp. 932 (S.D.N.Y.1990) (no standing for former president of brokerage firm claiming loss of salary and commission as well as forced resignation resulting from employer's predicate acts of extortion, mail fraud, and wire fraud); *Giuffre v. Metropolitan Life Ins. Co.*, 129 F.R.D. 71 (S.D.N.Y.1989) (no standing for employee whose termination was the alleged "outcome" of scheme to defraud employer's customers); *see also O'Malley v. O'Neill*, 887 F.2d 1557 (11th Cir.1989); *Cullom v. Hibernia Nat'l Bank*, 859 F.2d 1211 (5th Cir.1988); *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201 (1st Cir.1987); *Nodine v. Textron, Inc.*, 819 F.2d 347 (1st Cir.1987) (all concluding that employee lacked standing to recover for injuries resulting from their reporting or refusal to participate in employer's alleged RICO violations).

The starting point for all of these "refusal to cooperate" decisions is the recognition that in order to have standing under RICO, a plaintiff must demonstrate that the harm he suffered is the *direct* result of a predicate act or the alleged pattern of racketeering activity. Many of the conclusions that the plaintiff lacked standing, therefore, were grounded on the determination that the alleged RICO violations were aimed at someone other than the plaintiff or that the asserted injury was too "remote" to be attributed to them.

In *Burdick v. American Express Co.*, for example, the plaintiff claimed to have been fired by his defendant-employer after protesting and refusing to participate in

the employer's allegedly fraudulent activities. Beginning with the observation that Burdick could only establish standing if he showed "that the damage to his business or property resulted from the alleged mail and securities fraud," the Second Circuit first stated that any injury to defendant's *customers*—who were the intended victims of the defendants' frauds—could not be used to satisfy that requirement. 865 F.2d at 529. Noting that Burdick had also argued that the frauds had injured *him* by "interfer[ing] with [his] ability to service his customers, keep them happy and earn a living for himself," the Court nonetheless rejected this attempt to establish standing on the theory that "this type of harm is simply too remotely related to the predicate acts of mail and securities fraud to support a claim under RICO." *Id.* Finally, the Court rejected Burdick's claim that he was discharged "as a result of" his complaints concerning the defendant's fraudulent activities. Relying on the First Circuit's decision in *Nodine v. Textron, Inc.*, the Court reasoned that any injury to Burdick's business or property flowed from the defendant's decision to fire him, rather than from the pattern of racketeering activity in which the defendant engaged.[3] *Id.* (citing *Nodine*, 819 F.2d at 349).

In *Hecht v. Commerce Clearing House*, similarly, the plaintiff argued that because he refused to cooperate in the concealment of his employer's frauds upon the company's customers, he lost commissions as well as his job. Turning first to Hecht's claim that the racketeering conduct caused him to lose commissions, which was apparently pleaded in an attempt to differentiate the case from the line of cases declining to find standing for discharged employees, *see* 897 F.2d at 24 n. 2, the Second Circuit stated:

> This injury is too speculative to confer standing, because Hecht only alleges that he would have lost commissions in the future, and not that he has lost any

yet. *Even assuming that Hecht actually lost commissions, we hold that his injury was not proximately caused by violations of section 1962(c).*

897 F.2d at 24 (emphasis added). That holding was based on the observation that because Hecht was " 'neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s],' the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not reasonably foreseeable as a natural consequence of the RICO violations." *Id.* (quoting *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir.1988)).

The Court next addressed Hecht's claim that his discharge was an overt act in furtherance of the alleged RICO conspiracy, and that his injury was therefore the direct result of the defendants' violation of 18 U.S.C. § 1962(d). Rejecting Hecht's argument that he had standing to assert this violation even in the absence of standing to assert the substantive violation, the Court explained:

> [S]tanding may be founded only upon injury from overt acts that are also section 1961 predicate acts, and not upon any and all overt acts furthering a RICO conspiracy.... Because the overt act of Hecht's discharge was not a section 1961(1) predicate act, his loss of employment does not confer civil standing.

*Id.* at 25 (citation omitted).

**D.** *Application to Haviland's Allegations*

■ With the above precepts in mind, we now review Haviland's allegations to determine whether they are sufficient to confer standing. Because the two alleged "subschemes" involve different types of predicate activity and different types of injury, we consider them each separately.

---

**3.** In addition, the *Burdick* Court rejected Burdick's suggestion that his claim that he was discharged as "an integral part of the illegal scheme, rather than in retaliation for reporting it," should make a difference in its standing analysis. Again relying on a decision of the

First Circuit, the Court agreed that any differentiation between "preventive" and "retaliatory" dismissals would serve no useful purposes in this context. 865 F.2d at 529–30 (citing *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir.1987)).

The Mail and Wire Fraud Allegations

The complaint first asserts that Aron participated in a three year scheme to defraud Haviland into remaining at Goldman by engaging in thousands of acts of mail fraud and a more limited number of acts of wire fraud. These violations are based on alleged misrepresentations made to Energy Futures' clients regarding Goldman's intention to prevent the disclosure of confidential information to Aron. Haviland alleges that the misrepresentations were made in one of two ways: either directly by Goldman in advertisements or publications such as the Goldman annual report; or indirectly through Haviland in mailings, advertisements or telephone calls "that were either foreseeable to [Goldman and Aron] or explicitly authorized by [Goldman and Aron]." ¶ 67. Haviland contends that this scheme to defraud deprived him of the opportunity to leave Goldman at the height of his career to seek lucrative employment elsewhere.

In arguing that these allegations are sufficient to confer standing, Haviland does not take issue with the "refusal to cooperate" line of cases typified by *Hecht* and *Burdick*. He attempts to distinguish their holdings, however, on the grounds that the unlawful schemes alleged in those cases were directed at persons or entities other than the plaintiff, whereas this alleged scheme to defraud was directed at Haviland himself.

Having construed the facts alleged in Haviland's complaint in the most generous light available, we find ourselves unable to accept Haviland's characterization of the scheme at hand. As an initial matter, we question whether the alleged scheme injured plaintiff in his "business or property." Haviland concedes that Goldman and Aron took no steps to obtain confidential information from him during the timeframe of the alleged mail and wire frauds, and that the so-called "Chinese wall" was never in fact breached. *See* Transcript of Oral Argument Dated December 19, 1991 at 12–14 (hereinafter "Trans."). Thus, Haviland could have left Goldman at any time during the alleged scheme to defraud with his reputation and job prospects intact.

Even assuming an injury to Haviland's business or property, the *Hecht* and *Burdick* line of cases teaches that plaintiff can only establish standing by demonstrating that the predicate acts of mail or wire fraud *directly* deprived him of the opportunity to seek alternative employment. Since the alleged misrepresentations were made only to *clients* of Goldman, however, any proximate injury resulting from this scheme would have been to those clients rather than plaintiff. *Accord Miller v. Helmsley*, 745 F.Supp. at 938 (no standing where only plausible victims of predicate acts were "individuals and entities other than Miller"); *Giuffre v. Metropolitan Life*, 129 F.R.D. at 75 (no standing where fraudulent scheme, to the extent it existed, would have been "directed to Metropolitan policy holders"). Haviland as much as concedes this point in acknowledging that "defendant's ultimate goal was surely to defraud Goldman's customers by secretly obtaining Haviland's confidential information." Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss at 24 (hereinafter "Pl. Mem.").

In rejecting Haviland's contention that "the illegal activity was directed only at [him]," Pl. Mem. at 24, we are influenced not only by the Supreme Court's instruction that we need not "accept as true a legal conclusion couched as a factual allegation," *see Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986), but by prior courts' willingness to look beyond the conclusory assertions in the complaint and examine the factual basis of plaintiffs' claims. In *Giuffre v. Metropolitan Life Ins. Co.*, for example, Judge Duffy carefully scrutinized the plaintiff's claim that his termination was not merely a "byproduct" of the defendant's racketeering activity, but was rather the intended goal of the alleged fraud. Judge Duffy rejected that contention and dismissed the RICO claims for lack of standing, writing:

To accept the truth of [Giuffre's] allegations would be to give credence to what is simply an incredulous and unsupported assertion that Metropolitan established a

nationwide fraudulent scheme for the sole purpose of firing Mr. Giuffre.... We are under no obligation to do so. 129 F.R.D. at 75. In this case, similarly, crediting Haviland's interpretation of the facts would force us to accept that Goldman and Aron perpetrated thousands of violations of the mail and wire fraud statutes for the purpose of inducing Haviland to remain at Goldman. Because we decline to do so, Haviland's attempt to establish standing on the basis of the alleged mail and wire fraud scheme must fail.

The Attempted Extortion Allegations

■ Haviland next argues that he has standing under the RICO statute by virtue of Aron's alleged violations of the Hobbs Act. Specifically, Haviland asserts that Goldman and Aron pressured him to divulge confidential client information, and that when he refused to do so, Goldman gave him "a meager $17,000 raise, from $583,000 to $600,000, for 1987" (¶ 23), reduced his 1988 compensation by $100,000 to $500,000 (¶ 27), and summarily fired him in February 1989 (¶ 29). Just as he did in describing the alleged scheme to defraud, Haviland asserts that the Hobbs Act scheme was directed *at him* and that the resulting injuries were therefore sufficiently proximate to confer standing under RICO.

As an initial matter, and although Haviland contends that each request to divulge confidential information constitutes a separate violation of the Hobbs Act, we question whether the allegations in the complaint amount to more than one predicate act of attempted extortion. While Haviland contends that at least those threats accompanied by an intermediate adjustment to Haviland's salary give rise to separate violations, we are not convinced that that explanation is dispositive. *See* Trans. at 15.

Even assuming that Haviland's allegations could support multiple predicate acts of extortion, however, we find them insufficient to establish standing. In the first place, Haviland's insistence that he was the intended target of the scheme to obtain confidential information is simply belied by

his concession that "defendant's ultimate goal was surely to defraud Goldman's *customers.*" Pl. Mem. at 24. Whether or not plaintiff was the necessary source of such information, therefore, any proximate injury resulting from the alleged extortion would have been to Goldman's clients, and Haviland's own injuries would have been attributable to his refusal to participate in the allegedly fraudulent scheme. Since that type of injury is clearly insufficient to confer standing under the *Hecht* line of cases, Haviland's argument must fall.

Perhaps more important than Haviland's implausible assertion that he was the target of Aron's racketeering activity is the fact that the RICO claims appear to have been drafted in a conscious attempt to plead around the holdings of the "refusal to cooperate" cases. While we are mindful of our obligation to assume the truth of Haviland's *factual* allegations on a motion to dismiss, we need not credit his legal conclusions or the labels he has selected for the predicate acts. With that definition of our task in mind, we find Haviland's allegation that he was penalized for refusing to yield to an attempted extortion to be indistinguishable from other employees' claims that they were penalized for refusing to join in an unlawful scheme. *See, e.g., Hecht*, 897 F.2d at 22 (plaintiff claimed that he either had to "cooperate with the concealment of [the] frauds or lose his job"); *Norman*, 873 F.2d at 635–36 (plaintiffs claimed that they were "subjected to harassment and intimidation tactics" including false performance evaluations and demotions because they "threatened [defendant's] ability to hide the true state of affairs"). In short, the difficulty we have with crediting Haviland's assertion that the Hobbs Act allegations distinguish his case from the *Hecht* cases is that every one of the latter cases could also have been pled in this manner.

Having determined that the facts underlying Haviland's Hobbs Act allegations are materially similar to those underlying the "refusal to cooperate" cases, it is but a small step to our legal conclusion that Haviland also lacks standing to pursue those

claims under the RICO statute. Other courts addressing the standing issue have displayed a similar willingness to question plaintiffs' claims that they were the "true" targets of their employers' unlawful activities.

In *Burdick*, for example, the Second Circuit rejected the plaintiff's attempt to allege a more proximate injury by claiming that he was discharged as "an integral part of the illegal scheme, rather than in retaliation for reporting it." *Burdick*, 865 F.2d at 529. Instead, the Court found that a distinction between "preventive" and "retaliatory" discharge would serve no useful purpose in the standing context, since in either instance the injury to a plaintiff flows from the employer's decision to fire the employee rather than the predicate racketeering activity. *Id.* at 529–30. In *Norman*, similarly, the Second Circuit found that the plaintiffs lacked standing to assert their claims of retaliatory harassment, despite their efforts to allege a proximate injury by "seek[ing] to make themselves victims of [the defendant's] scheme." *Norman*, 873 F.2d at 636. In *Miller v. Helmsley*, the plaintiff went so far as to allege a "Fraudulent Scheme Against Miller." Judge Conboy rejected this transparent attempt to establish standing, however, finding that Miller's conclusory self-description as the target of the frauds could not defeat the fact that his employer was the direct target of the racketeering activity and any injury Miller suffered in the form of lost commissions or salary would have "trickled down" indirectly. *Miller*, 745 F.Supp. at 938. Finally, in the previously mentioned *Giuffre* case, Judge Duffy refused to credit the plaintiff's contention that the unlawful scheme was directed at him, noting that in order to do so, he would have had to accept the farfetched assertion that the defendant established "a nationwide fraudulent scheme for the sole purpose of firing [the plaintiff]...." *Giuffre*, 129 F.R.D. at 75.

As the above excerpts reflect, courts addressing the issue of RICO standing in the context of "refusal to cooperate" claims have made clear that the proximate injury requirement for standing is a rigorous one, and that efforts to plead around it solely for the purposes of avoiding its impact will not be tolerated. A number of these courts have also articulated a rationale for their vigilance in this area: that "the purpose of civil RICO does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies." *Hecht*, 897 F.2d at 24; *see also Norman*, 873 F.2d at 637 ("Artful invocation of controversial civil RICO ... cannot conceal the reality that the gravamen of the complaint herein is ... harassment [under § 210 of the Energy Reorganization Act]"); *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 49 (1st Cir.1991) (Even if defendant's conduct in firing the plaintiff was reprehensible, the RICO statute "cannot be used as a surrogate for local law....").

In sum, it is clear that plaintiff's creative pleading simply cannot disguise the fact that the intended victims of the alleged scheme to defraud and attempted extortion were Goldman's clients, and that any injury Haviland suffered resulted from his refusal to accede to the scheme rather than the racketeering activity itself. As such, Haviland's injuries are too remote from the RICO violations to be deemed "proximate" and he lacks standing to pursue them under the RICO statute.

## III. CONCLUSION

For the reasons stated above, Haviland lacks standing to assert his claims under the RICO act and they are dismissed accordingly, without leave to replead. Because those claims provided the sole basis for Haviland's assertion of federal jurisdiction, Haviland's pendent claim of common law fraud is dismissed as well, without prejudice to its assertion in the state courts. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

SO ORDERED.