William R. MILLER, Plaintiff,

v.

Leona M. HELMSLEY, Joseph V. Licari, Martin Goldstein, William Lubliner, Morton Swirsky, Helmsley Enterprises, Inc., Realesco Equities Corp., Helmsley Hotels, Inc., Helmsley Palisades, Inc., Georgetown Aircraft Services, Inc., Deco Purchasing and Distributing Co., Inc., Five Twenty–One Corp., Windsor Park Apartments Associates, Garden Bay Manor Associates, 166 East 61st Street Associates, Parkchester Apartments Associates, Park West Village Associates, and Brown, Harris, Stevens, Inc., Defendants.

No. 89 Civ. 6148 (KC).

United District Court,
S.D. New York.

Aug. 29, 1990.

Abberley Kooiman by Henry J. Clay, Jr., Thomas J. Dolan, New York City, for plaintiff.

Kronish, Lieb, Weiner & Hellman by Alan Levine, Celia Goldwag Barenholtz, Melanie S. Cherdack, Richard A. Edlin, New York City, for Helmsley defendants.

Judd Burstein, P.C. by Judd Burstein, New York City, for defendant Licari.

## OPINION AND ORDER

CONBOY, District Judge:

This civil RICO action, to which various state law claims are appended, arises out of an employment relationship between the plaintiff and certain of the defendants.

## FACTUAL BACKGROUND [1]

Plaintiff William Miller ("Miller") was hired as an Executive Vice President of Brown Harris Stevens, Inc. ("BHS") in February 1984, and subsequently became the president of BHS in January of 1986. Complaint ¶ 3. BHS, a residential real-estate management and brokerage firm, is owned by Helmsley Enterprises, Inc. and Harry B. Helmsley ("Mr. Helmsley"). In addition to a salary, Miller's compensation as president of BHS included a bonus of 5% of BHS' pre-tax profits and a 20% commission on BHS' net commissions on sales of all Helmsley properties. Complaint ¶¶ 3, 53–56. It is also alleged that Mr. Helmsley promised an additional reward to Miller for BHS's *de facto* acquisition of the prime personnel and business of a competitor Douglas Elliman–Gibbon & Ives. Complaint ¶¶ 57–58. In a memorandum dated April 17, 1989, Miller voluntarily resigned as president of BHS, although he alleges that his departure was ordered by Mrs. Leona Helmsley, Harry Helmsley's wife. Complaint ¶ 41.

The federal jurisdictional predicate for this action is the civil RICO law, 18 U.S.C. § 1961 *et seq.* (1982). Miller has appended to the RICO claims in count 1 of his complaint twelve state law claims: that BHS breached its employment agreement with Miller (counts 2–7); that BHS breached an implied covenant of good faith in its dealings with Miller (count 8); that Mrs. Helmsley tortiously interfered with the employment agreement between BHS and Miller (count 9); that Mrs. Helmsley removed Miller as president of BHS with the sole intent of inflicting economic damage on Miller, thereby committing a prima facie

---

[1] The factual background is derived from the allegations in the complaint, which for the purposes of the pending motions, we must assume to be true. *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (citing *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972)).

tort (count 10); that Mrs. Helmsley made false representations regarding her corporate authority to fire Miller and thereby defrauded him when she forced him to resign (count 11); that Mrs. Helmsley made false and defamatory statements about Miller (count 12); and that Mrs. Helmsley violated her duties to BHS, "wasting" BHS's assets, and entitling BHS to an accounting (count 13).

The RICO claims are brought under section 1962(a)–(d) of Title 18 of the United States Code and against all of the defendants in the complaint except BHS. Plaintiff's Memorandum of Law in Opposition to the Defendants' Motions to Dismiss ("Pltf. Mem.") at 4. All of the defendants, including BHS, but excepting Joseph Licari ("Licari") are referred to by the parties as the Helmsley defendants [2] and have collectively moved to dismiss the federal claims in the complaint pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and for sanctions pursuant to Rule 11. These defendants also move to dismiss the state law claims for lack of subject matter jurisdiction or, in that alternative, pursuant to Rules 8(a), 9(b) and 12(b)(6). We observe that defendant Licari has submitted a separate motion to dismiss, arguing a lack of standing on a slightly different theory than the branch of the Helmsley defendants' motion directed to lack of standing. Licari also joins in the motions submitted by his co-defendants to the extent "applicable to him and not inconsistent with his own arguments." Defendant Joseph Licari's Memorandum in Support of His Motion to Dismiss the Complaint at 6. Accordingly, in this opinion, we will refer to all of the defendants collectively as having made the motion to dismiss, and will acknowledge Licari's separate arguments when necessary.

Count 1 of the complaint specifically alleges that the RICO defendants formed an association-in-fact enterprise through which they committed various offenses constituting predicate acts under RICO. Mrs. Helmsley and the other defendants are al-

leged to have used the enterprise in a "number of ways to defraud the IRS, to fraudulently wrest wealth, power, and control away from Mr. Helmsley, and to fraudulently injure or eliminate Miller, who could impede the pursuit of such purpose." Plft.Mem. at 4. There are three so-called "schemes" alleged: the "Extortion and Tax–Fraud Scheme"; the "Fraudulent–Transfer Scheme"; and the "Fraudulent Scheme Against Miller." The "Extortion and Tax–Fraud Scheme" basically rehashes the Government's criminal income tax case against Mrs. Helmsley, in which she was convicted of 33 of 47 counts, but, significantly, not of conspiracy to commit extortion, and makes the additional assertion that the defendant allocated certain business expenses and salaries to BHS instead of other Helmsley entities, thus deflating BHS's pre-tax profits. The "Fraudulent–Transfer Scheme" alleges that Mrs. Helmsley, in an attempt to circumvent a pre-nuptial agreement, defrauded Mr. Helmsley out of certain real property including 230 Riverside Drive and the Leslie Building and certain personal property including a corporate jet and bearer bonds valued at greater than $90 million. Complaint ¶¶ 34–36. Miller also asserts that Mrs. Helmsley thwarted Mr. Helmsley's plans to convert those buildings to cooperatives or condominiums, thereby causing BHS to lose sales commissions. Finally, the "Fraudulent Scheme Against Miller" alleges, in substance, that the defendants devised a plan to reduce BHS's profits, thereby reducing Miller's bonus and commissions, and that Mrs. Helmsley misrepresented her corporate authority to certain corporate officers, i.e., she stated that she had Mr. Helmsley's authorization to ask for Miller's resignation when she did not have such authority, thereby forcing Miller to resign his position as president of BHS.

Because we believe, for the reasons elaborated upon below, that the complaint must be dismissed for lack of standing under 18 U.S.C. § 1964(c), we do not address the Rule 8(a) and 9(b) aspects of the motions. Essentially, the question which we address

---

**2.** The other defendants not mentioned thus far are current or former employees of Helmsley-

owned entities as well as several of such entities themselves.

herein is whether a former employee, compensated in part on a percentage basis of the company's sales and pre-tax profits, has standing to assert a private RICO action against defendants who, by allegedly forming a RICO enterprise, operated three schemes in violation of 18 U.S.C. § 1962 which purportedly reduced a company's commissions and pre-tax profits as well as the plaintiff's professional status by forcing him to step down as the president of that company.

## ANALYSIS

In order to maintain a private RICO action "a plaintiff must show (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2nd Cir. 1990) (citing *O'Malley v. O'Neill*, 887 F.2d 1557, 1561 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990)). The motions in this case are directed to the lack of causation. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (the plaintiff must show injury "by the conduct constituting the violation"). It is imperative that the plaintiff show that he was injured by the conduct constituting the violation because " '[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct.' " *Sedima, supra,* 473 U.S. at 496, 105 S.Ct. at 3285 (quoting *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)). In this way, the standing section of the statute, section 1964(c), which allows private civil RICO suits to be brought only by "[a]ny person injured in his business or property by reason of a violation of section 1962," is directly intertwined with the causation element.

■ The injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts. *See Hecht*, 897 F.2d at 23; *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1100 (2d Cir.1988), *cert. denied,* ——

U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). However, "factual causation (e.g., 'cause-in-fact' or 'but for' causation) is not sufficient" by itself. *Hecht, supra,* 897 F.2d at 23; *see Department of Economic Development v. Arthur Anderson & Co., et al.,* No. 85 Civ. 1292 (CES), 1990 U.S. Dist. LEXIS 67 (S.D.N.Y. Jan. 8, 1990) ("The Second Circuit has asserted that legal liability under RICO does not extend as far as factual causation, only proximate causation."). The RICO pattern or acts must proximately cause plaintiff's injury. *Hecht, supra,* 897 F.2d at 23 (citing *Sperber v. Boesky*, 849 F.2d 60, 64 (2d Cir. 1988)). For the RICO pattern or acts to proximately cause a plaintiff's injury, they must be "a substantial factor in the sequence of responsible causation, and ... the injury [must be] reasonably foreseeable or anticipated as a natural consequence." *Hecht,* 897 F.2d at 23–24 (citing *Bonsignore v. City of New York*, 683 F.2d 635, 637 (2d Cir.1982); *Restatement (Second) of Torts* §§ 431, 435 comment b (1965)).

Defendants argue that Miller does not have standing to assert a RICO action "because the predicate acts of fraud and extortion that he has attempted to plead were not 'directed at him.' " Memorandum of the Helmsley Defendants in Support of Their Motion to Dismiss the Complaint ("Dfts. Memo."), at 8 (quoting *Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989)). The predicate acts alleged by Miller are: (1) extortion, in violation of New York law and the Hobbs Act, 18 U.S.C. § 1951; (2) mail fraud, in violation of 18 U.S.C. § 1341; and, (3) wire fraud, in violation of 18 U.S.C. § 1343. Complaint ¶ 27. The defendants argue that even if the plaintiff's "far-fetched allegations" are true, Miller lacks standing because the conduct complained of allegedly was intended to harm and had the consequence of injuring BHS and/or Mr. Helmsley and/or the IRS, not Miller. Defendants claim that Miller's injury is at best derivative of the injury to BHS, to whom the fraud was directed, and thus too remote to confer standing. Thus, the defendants assert that while Miller may be able to demonstrate factual causation, he has not established

and cannot establish the requisite proximate cause, and therefore the RICO claims should be dismissed. We will proceed to examine the relevant case authority before we consider Miller's specific claims.

Since the parties submitted their memoranda of law, the Second Circuit decided *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2nd Cir.1990), which we believe is completely on point. In *Hecht*, the court of appeals affirmed the trial court's holding that the plaintiff lacked standing to assert a civil RICO action despite his allegations that: (1) defendants' racketeering conduct proximately caused him to lose not only his job but also business commissions; and (2) that an overt act in furtherance of defendants' RICO conspiracy was his discharge from employment. *Id.* at 23. We believe that *Hecht* provides direct support for the defendants' argument and, in combination with the other cases cited by the defendants and upon which the *Hecht* court relied, is dispositive of the standing issue in this case.

In *Hecht*, the plaintiff argued that because he would not go along with the fraudulent practices of his employer directed at customers of the company, he lost commissions as well as his job. 897 F.2d at 22–23. With regard to Hecht's first claim, that the defendants' racketeering conduct caused him to lose commissions, the Second Circuit stated:

> [t]his injury is too speculative to confer standing, because Hecht only alleges that he would have lost commissions in the future, and not that he had lost any yet. *Even assuming that Hecht actually lost commissions, we hold that his injury was not proximately caused by violations of section 1962(c).*

*Id.* at 24 (emphasis added). This holding was founded upon the reasoning that:

> Because Hecht was "neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s]," the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not reasonably

foreseeable as a natural consequence of the RICO violations.

897 F.2d at 24 (quoting *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir.1988) (holding that injuries allegedly caused by Boesky's RICO violations were too attenuated to confer standing on investors in a civil RICO suit) (brackets in original)).

With respect to Hecht's second claim, that his discharge was an overt act in furtherance of the alleged conspiracy, and thus that his injury directly resulted from defendants' violation of section 1962(d), the Second Circuit held that:

> standing may be found only upon injury from overt acts that are also section 1961 predicate acts, and not upon any and all overt acts in furthering a RICO conspiracy.... *Because the overt act of Hecht's discharge was not a section 1961(1) predicate act, his loss of employment does not confer civil standing.*

*Id.* at 25 (emphasis added) (citation omitted).

Similarly, in *Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989), a case relied on by the court in *Hecht*, the plaintiff, a former employee of the defendant, alleged that he was fired when he became aware of certain allegedly illegal practices engaged in by the defendant and refused to participate in such activities, and in fact, complained to his supervisor and others of the purportedly illegal practices on numerous occasions. *Id.* at 529. The plaintiff argued that although the harm was directed at the defendant's customers, he had standing because the fraud in which he alleged the defendants were involved also " 'interfere[d] with [plaintiff's] ability to service customers, keep them happy and earn a living for himself.' " *Id.* The district court dismissed the complaint for lack of standing and the circuit court affirmed, reasoning that in order to establish standing under 18 U.S.C. § 1964(c), the plaintiff "must show that the damage to his business or property resulted from the alleged mail and securities fraud, the predicate acts constituting the violation in th[at] case." *Id.* Accordingly, the court held

that "this type of harm is simply too remotely related to the predicate acts of mail and securities fraud to support a claim under RICO." *Id.*

With regard to Burdick's other claim, that he was dismissed "as a result of" his complaints concerning the defendant's fraudulent activities, the Second Circuit explicitly agreed with and adopted the reasoning of the First Circuit's decision in *Nodine v. Textron, Inc.*, 819 F.2d 347 (1st Cir. 1987), in which the RICO claims of a discharged employee brought against his former employer were dismissed. *Id.* at 529. In *Nodine*, the First Circuit held that because the injury resulted from the employer's decision to fire the employee after he reported the illegal scheme to his supervisors, "[f]iring [the employee] under these circumstances was wrong, but did not violate the RICO act." *Id.* 349. In adopting the First Circuit's reasoning, the Second Circuit further reasoned that "[a]s to Burdick's claim that he was discharged as an integral part of the illegal scheme, rather than in retaliation for reporting it, we are in agreement with the observation ... that a differentiation between 'preventative' and 'retaliatory' dismissals in this context would serve no useful purpose." *Burdick*, 865 F.2d at 530 (citing *Pujol v. Shearson/American Express Inc.*, 829 F.2d 1201, 1205 (1st Cir.1987)).

In addition, *Warren v. Manufacturers National Bank of Detroit*, 759 F.2d 542 (6th Cir.1985), cited with approval by the Second Circuit in *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986), is germane. The court in *Warren* upheld the district court's ruling that the plaintiff therein, a creditor, sole shareholder, and chairman of the board of the company forced into bankruptcy by the defendant, lacked standing to assert a civil RICO action, despite the fact that he lost his job as a result of the bankruptcy. The court reasoned that:

> The alleged acts of fraud were directed not toward plaintiff as an employee of Paragon, but rather were directed to Paragon as a corporate entity or person. Assuming the truth of plaintiff's claim, the fraudulent misrepresentation was made to Paragon, not to any individual as such. Any injury Warren suffered as a result of this fraud, here his lost employment, was merely incidental to the corporation's injury. Plaintiff has no more standing as an employee than he does as a shareholder of Paragon. We cannot rationally justify individual employee claims where the corporate employer is the victim.

*Warren*, 759 F.2d at 544–45.

As we stated above, Miller claims that Mrs. Helmsley improperly charged excessive salaries and expenses of other Helmsley entities to BHS, which had the effect of reducing BHS's pre-tax profits, and which thus diminished Miller's percentage bonus thereof. Complaint ¶¶ 28–32. Miller also asserts that in Mrs. Helmsley's attempt to deprive Mr. Helmsley of, among other things, two properties, which Miller alleges were fraudulently transferred to Mrs. Helmsley by Mr. Helmsley as a gift, Miller was deprived of commissions. Complaint ¶¶ 33–36 (also accusing Mrs. Helmsley of defrauding Mr. Helmsley of a corporate jet, of his interest in defendant Georgetown Aircraft, of dividends in Helmsley Enterprises, and of $90 million worth of bearer bonds). Miller asserts that Mr. Helmsley purportedly promised Miller that BHS, as selling agent, would convert the properties from rentals to condominiums or cooperatives, thereby increasing BHS's profits and Miller's bonus. Complaint ¶¶ 33–35. The fact that the properties were given to Mrs. Helmsley meant that the properties would not be converted, and thus, there would be no revenue to BHS as selling agent, and concomitantly, no bonus for Miller. Miller also claims that he suffered damages when BHS's commissions were reduced on the Park West project, asserting that the reduction affected his bonus. Complaint ¶ 50.

Miller, in his complaint, thus concedes that he was not the target of the racketeering scheme: as he explains, his lost commissions were the result of "the scheme to deprive Mr. Helmsley of property through fraudulent transfers." Pltf. Mem. at 5.

**938**

He also claims that the IRS and BHS were the targets of the fraudulent scheme. *See id.* Specifically, the plaintiff asserts that the defendants "used the Enterprise in a number of ways to defraud the IRS, to fraudulently wrest wealth and power, and control away from Mr. Helmsley, and to fraudulently injure or eliminate Miller, *who could impede the pursuit of such purpose.*" *Id.* at 4 (citing to ¶¶ 19–51 of the Complaint) (emphasis added). Miller's contention that the defendants were concerned that he would "impede the[ir] purpose" further emphasizes that the target of the alleged RICO actions could not have been Miller.

As Judge Stewart recently stated in *Department of Economic Development v. Arthur Anderson & Co., et al.*, No. 85 Civ. 1292 (CES), 1990 U.S. Dist LEXIS 67 (S.D. N.Y. Jan. 8, 1990), "[i]n short, the Second Circuit [has] concluded that plaintiffs who are either targets of the racketeering enterprise, competitors, or customers of the racketeer are those plaintiffs who were probably intended by Congress to recover under RICO." *Id.* (citing *Sperber,* 849 F.2d at 65); *see also Hecht,* 897 F.2d at 24. With respect to the alleged actions taken by the defendants that purportedly affected BHS's commissions and pre-tax profits, Miller clearly does not fit into any of these categories. With regard to the other frauds Miller alleges Mrs. Helmsley perpetrated upon Mr. Helmsley (such as the "fraudulent transfer" of the bearer bonds and the aircraft), we can discern no connection whatsoever to the plaintiff.

■ Furthermore, Miller makes no effort to distinguish *Burdick,* the relevant and controlling case authority at the time his brief was filed; he simply declares that it is inapplicable. Pltf. Mem. at 17, 19, 27–28.[3] We disagree. The facts of *Burdick* are largely indistinguishable from the instant case, and Miller has not demon-

strated that *Burdick* is no longer good law. Indeed, the holding of *Burdick* was recently reaffirmed by the court's decision in *Hecht.* We observe that Miller has not met the first requirement of *Burdick* as his claimed injuries do not result from any of the *predicate* acts alleged. The three predicate acts that are attributed to the defendants in his complaint are extortion, mail fraud, and wire fraud. Complaint at ¶ 27. The alleged victims of these crimes were individuals and entities other than Miller.

■ Indeed, as reflected in the only portion of the complaint which describes harm to Miller, "The Fraudulent Scheme Against Miller," Miller can only be categorized as an indirect secondary victim of these alleged frauds. Although RICO liability may be imposed for indirect as well as direct injury, *Sperber v. Boesky,* 849 F.2d 60, 65 (2nd Cir.1988), "the practical boundary . . . to liability for indirect consequences of RICO predicate acts" is proximate cause. *See In Re Crazy Eddie Securities Litigation,* 714 F.Supp. 1285, 1291 (E.D.N.Y.1989). Here, although it may be said that Miller's alleged injury of reduced commissions and bonus were factually caused by the defendants alleged RICO violations, we conclude that this injury, which "trickled down" to Miller only after his employer BHS was injured, is too remote from the alleged predicate acts to support RICO standing as a matter of law. *See Hecht,* 897 F.2d at 24; *Burdick,* 865 F.2d at 529.

Miller's citation to *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989), wherein the court concluded that the plaintiff's injury was proximately caused by the RICO violations, is unavailing. Contrary to his assertion, the facts alleged in Miller's complaint are not

---

3. For example, plaintiff claims that *Burdick* (as well as *inter alia,* the district court's decision in *Hecht,* 713 F.Supp. 72 (S.D.N.Y.1989), which was affirmed by the Second Circuit), is not applicable because Miller has not alleged that he is a "whistleblower." This argument is unavailing as the court in *Burdick* rejected the plaintiff's claim there to the extent that he argued that had been fired as an integral part of

the illegal scheme rather than in retaliation for reporting it. *Burdick, supra,* 865 F.2d at 529. Thus, the principle of *Burdick,* as recently confirmed by the court in *Hecht, supra,* 897 F.2d at 24, is that an unjust discharge claim does not become a federal RICO claim merely by recasting it in terms of refusal to participate in RICO fraud or retaliation for reporting RICO fraud.

comparable to those of *Bankers Trust*. That case involved a fraudulent scheme aimed at several parties including the corporate defendant itself (BAC), the bankruptcy court, and the creditors of the company such as Bankers Trust. The circuit court held that "regardless of the fact that [the bankrupt company] might also have suffered an identical injury for which it has a ... right of recovery," the plaintiff Bankers Trust was not precluded from seeking recovery for injuries it suffered as a proximate result of the defendants' RICO violations. *Id.* at 1101. Although it is true that the court in *Bankers Trust* implicitly held that the corporate defendant suffered injury as a result of its officers' acts, it was crucial to the holding of the case that Bankers Trust was not suing for injuries suffered by the corporate defendant, but for injuries the bank suffered directly. Thus, as the plaintiff in *Bankers Trust* was directly injured by, and indeed the intended target of, the defendants' fraudulent conduct (bribery, perjury, fraud and bankruptcy fraud), that case is clearly distinguishable from the facts of this case.

■ Here, even if we assume for argument's sake that Miller is a creditor of BHS, Miller's injuries are not similar to those suffered by Bankers Trust as he has not shown that any of the alleged acts of fraud were directed at him. The only similarity between this case and *Bankers Trust* is that Miller has demonstrated that the corporate entity, BHS, may have been injured; however, unlike the bank in *Bank-*

*ers Trust*, he has not established that his own injury was proximately caused by the defendants' RICO violations.[4]

■ With regard to Miller's claim that he was forced to step down as President and suffered damages as a result, we conclude that this injury does not confer standing either. The alleged fraudulent misrepresentation of Mrs. Helmsley which allegedly caused him to resign was (1) made to Rodger Tuckerman, another BHS employee and not directly to the plaintiff; and (2) made with the intent to "eliminate Miller, who could impede the pursuit of the [defendants'] purpose." Pltf. Mem. at 4. This asserted purpose was "to fraudulently wrest wealth, power and control away from Mr. Helmsley." *Id.*

Here, too, Miller has failed to fulfill the first requirement of *Hecht* and *Burdick*, that the injury must be the result of a predicate act, not merely an act in furtherance of the conspiracy, as he has failed to demonstrate that Mrs. Helmsley's purported misrepresentation—that she had the authority to remove Miller as president of BHS—was a section 1961(1) predicate act, *see supra* at 936–937. Indeed, in his memorandum of law, plaintiff argues that "[t]he fraudulent scheme that tricked Miller into stepping down as President of BHS, while not in the best interests of BHS given Miller's performance, was also in furtherance of the alleged motive and underlying purpose of the Enterprise." Pltf. Mem. at 41. Moreover, as *Hecht* and *Burdick*

---

4. In light of their near-frivolous nature, Miller's allegations that he was harmed as a result of the scheme to defraud the IRS need be addressed in this footnote only. Miller relies upon Mrs. Helmsley's tax fraud conviction to demonstrate that BHS was harmed by Mrs Helmsley's conduct and that, as a result, he too was harmed. We note, first, that Miller only became entitled to a percentage of BHS's profits in July of 1986, Complaint ¶ 55, after the conduct alleged in the indictment took place. Miller asserts that we should conclude that "the tax-fraud activity continued beyond the period specified in the indictment." Pltf. Mem. at 27. As all complaints must be well-grounded in fact, and with fraud complaints subject to even more rigorous standards than other complaints, we will not allow rank speculation or surmise of this sort to substitute for fact.

Second, even if there were facts allowing an inference of continued tax fraud activity, Miller still would not have standing as the alleged diminution of his bonus as a result of a scheme to defraud the IRS by putting improper expenses on BHS's books and records is even more attenuated than the injury suffered by the plaintiff in *Burdick*. An injury which flows from a fraud aimed at the Government in the first instance and at BHS in the second, and which has only a tertiary effect on the plaintiff is "simply too remotely related to the predicate acts of ... fraud to support a claim under RICO." *Burdick*, 865 F.2d at 529. Moreover, the cases plaintiff cites at pages 23–27 of his brief are inapposite, as there the plaintiffs demonstrated that, unlike Miller, they were the primary victims of a fraudulent scheme which also had the effect of defrauding the IRS.

make clear, the fact that Miller ceased to be employed by BHS does not rise to the level of a RICO violation. *Hecht*, 897 F.2d at 25; *Burdick*, 865 F.2d at 527.[5]

Accordingly, for all of the foregoing reasons, neither plaintiff's loss of employment nor his reduced commissions and/or bonus confers standing on the plaintiff under RICO. Thus, we need not and do not address the other grounds for dismissal asserted by the defendants, for without RICO standing, the plaintiff's complaint must be and hereby is dismissed. Because the Second Circuit case authority, which greatly clarified the law in this circuit and upon which we rely in large part, was decided after the submission of the briefs, we decline the defendants' request to impose sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.

SO ORDERED.

---

**5.** Licari's argument regarding the plaintiff's lack of standing focusses on the predicate acts of mail fraud that Licari is alleged to have committed. Licari argues, relying on rather persuasive dicta from two Second Circuit cases, *Corcoran v. American Plan Corp.*, 886 F.2d 16, 19 (2d Cir.1989) and *United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988), which dicta was also cited approvingly in *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 794 n. 13 (1st Cir.1990); *but see Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 973 (S.D.N.Y.1989), that the party injured must also be the party deceived, and that consequently, Miller's claims must be dismissed as he admits that he was not the party that was deceived. We need not address the question of whether the mail fraud statute is indeed satisfied by establishing the existence of a scheme to deceive one party, thereby depriving another of property (although, in view of the case authority, we express doubt as to the soundness of such a proposition), in light of our disposition above that any injury Miller suffered is simply too remote from the alleged fraudulent conduct to predicate RICO liability.