**Violet O'KEEFE, Plaintiff,**

v.

**GENERAL ACCIDENT INSURANCE COMPANY, Defendant.**

No. 92 CV 7503.

United States District Court, S.D. New York.

March 5, 1996.

Menagh, Trainor, Mundo & Falcone, New York City, for Plaintiff.

William P. Harrington, Bleakley, Platt & Schmidt, White Plains, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff Violet O'Keefe ("O'Keefe")[1] brings this action against defendant General Accident Insurance Company for disparate treatment and retaliation in violation of the Civil Rights Act of 1964 (as amended 1972), 42 U.S.C. § 2000(e) et seq. Title VII Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (as amended 1978) (West 1985) ("ADEA"); the New York Human Rights Law, N.Y.Exec.Law § 290 et seq. Before

---

1. On April 12, 1995, O'Keefe died. On March 1, 1995, pursuant to F.R.C.P. 6(b) and 25(a), this Court granted P.J. O'Keefe's motion for substitution as executor for Violet O'Keefe.

the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56(c).

## FACTS

### A. Discriminatory Atmosphere

In February of 1987, O'Keefe began working for General Accident Insurance Company ("General Accident") as a Premium Audit Control Clerk.[2] At that time, she was 54 years old. O'Keefe was hired by George O'Neill, and initially reported to Joe Pomara, the Branch Manager. She was promoted to Underwriter Trainee[3] in July, 1988. O'Keefe was then promoted to Underwriter I in Commercial Lines[4] in July, 1989.

O'Keefe alleges that she began encountering problems in her position in August of 1988, when Hank McLaughlin ("McLaughlin") became Underwriting Manager of the White Plains office of General Accident. O'Keefe reported directly to McLaughlin at that time and recounts several incidents where McLaughlin was allegedly abusive to her. For instance, McLaughlin frequently knocked on the glass door of his own office to alert O'Keefe—who was sitting outside—and then once he got her attention, taped a "Do Not Disturb" sign to the glass. McLaughlin also shouted at O'Keefe from time to time, belittled her, and mocked her. While O'Keefe fails to provide specific examples of these particular incidents, they apparently took place in front of her colleagues. In fact, one of her supervisors, Nancy Ruggiero, and a fellow co-worker, Susan Coleman told Mike Smith, the Commercial Lines Underwriting Supervisor, that McLaughlin's constant belittling of O'Keefe was embarrassing to watch.

There is also evidence that McLaughlin impeded O'Keefe's progress at work. According to O'Keefe, McLaughlin frequently joked about testing O'Keefe and her colleagues. On one occasion, though, he did actually test the group. However, everyone

but O'Keefe had been given a copy of the test just before it was administered. Not surprisingly, O'Keefe failed. O'Keefe also contends that McLaughlin never responded to her work-related questions, although he did discuss sports with male employees two to three times a week.

There is also some evidence that others at General Accident made discriminatory comments regarding age or sex. For example, one employee joked that an older employee's clothes were not "the latest style." One time O'Keefe forgot something and Nancy Ruggiero, her supervisor, remarked, "That comes with age." Joe Pomara, the branch manager, allegedly commented that some female employees wore "revealing" clothing. He also told O'Keefe that some women at General Accident were more interested in finding a partner than they were in their work. In another instance, McLaughlin allegedly asked a female employee during a disagreement, "You're not going to cry?"

### B. O'Keefe's Termination

#### 1. O'Keefe's version of events

There is sharp disagreement as to the course of events leading to O'Keefe's termination. O'Keefe contends that in October of 1991, McLaughlin called her and her supervisor, Ruggiero, into his office and said, "Why don't you look for another job?" She said that she did not want to look for another job. McLaughlin then suggested she take a job in Personal Lines. Believing that the proposed transfer was qualitatively different from her job in Commercial Lines, O'Keefe declined the transfer offer. Not only did she think that the job would be a demotion, but she would still be reporting to McLaughlin. According to O'Keefe, at that time it was unclear to her that her refusal to switch positions would result in any adverse effect on her employment.

2. O'Keefe's duties as a Premium Audit Control Clerk included estimating the payroll of the policies for Workers Compensation.

3. O'Keefe's duties as Underwriter Trainee included renewing casualty line policies, property line policies, fire policies, Workers Compensation policies, and inland marine policies.

4. O'Keefe's duties as a Commercial Lines Underwriter included analyzing risks of an insured class and establishing the appropriate insurance rate of the assigned policy.

On March 9, 1992, O'Keefe attended a meeting with McLaughlin; Diane Berkowitz, Manager of Operations; Lee Raffaele, Human Resources; and Calvin Byrd, Home Office Human Resources (via speaker phone). At that time, Byrd asked O'Keefe if she wanted to accept the transfer to Personal Lines. O'Keefe declined again to take the position. At that time Byrd stated, "Well, I'll have to terminate you."

### 2. General Accident's Version of Events

General Accident, on the other hand, contends that on July 2, 1991 and again on October 17, 1991, O'Keefe was informed that her job performance was deteriorating and inadequate. In October or early November of 1991, McLaughlin again informed O'Keefe that her work performance was "not adequate," and then offered her a lateral transfer from a grade 11 position in Commercial Lines to a grade 11 position in Personal Lines. The job in Personal Lines held the exact same salary and benefits, as well as the same promotional opportunities. When she refused the transfer, McLaughlin told her that she should consider looking for another job.

From that point, O'Keefe was sent to a Property Underwriting course in Philadelphia. In total, sixteen people attended the course. She and four others attending the course failed. Later that month she was administered another test at work which she also failed.

On March 9, 1992, O'Keefe attended another meeting where, according to General Accident, due to her performance deficiencies, she was offered a choice between the lateral transfer and termination. She refused the lateral transfer and was subsequently fired.

## DISCUSSION

### A. Standard For Summary Judgment

██ Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); see also *Gallo v. Prudential Residential Servs. Ltd*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party must meet a burden of coming forward with "specific facts, showing that there is a genuine issue of fact for trial," Fed.R.Civ.P. 56(e) by a showing sufficient to establish the existence of [every] element essential to the party's case, and on, which the party will bear the burden of proof at trial.

██ In deciding whether a genuine issue of material fact exists, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). The Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby Inc*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), however, and to grant summary judgment where the nonmovant's evidence is merely colorable conclusory, speculative or not significantly probative. *Knight v. United States Fire Ins.*, 804 F.2d 9, 12–15 (1986), *cert denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Because proof of discrimination is in most instances circumstantial, courts have developed a three step procedure to allocate the burden of producing proof. First, plaintiff must establish a prima facie case; second, if the plaintiff makes out a prima facie case, the defendant has the burden of articulating a legitimate non-discriminatory reason for its actions; third, if the employer carries its burden, the plaintiff has the opportunity to demonstrate by a preponderance of the evidence that the legitimate reason proffered by the defendant is a pretext for discrimination. See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

## B. Age and Gender Discrimination

O'Keefe contends that General Accident's conduct amounted to unlawful termination under both Title VII and the ADEA. General Accident contends that because O'Keefe was offered a lateral position, she was not fired and thus has no basis to sue for unlawful termination. At most, General Accident argues, O'Keefe's has stated a claim for constructive discharge. Defendants argue that because O'Keefe contends that she was forced to choose the transfer to a new job or to be fired from the position she held at General Accident, we should apply a constructive discharge analysis. O'Keefe argues, however, that she was terminated outright. Because the facts which determine which analysis to apply are in dispute, we draw all inferences in favor of the plaintiff and thus apply a straight termination analysis.

### 1. Prima Facie Case of Discrimination

■ To state a prima facie case of age and sex discrimination in employment, a plaintiff must establish that: (i) she was a woman in a protected age group, (ii) she was qualified for her job, (iii) she was discharged, and (iv) the discharge occurred in circumstances which give rise to an inference of age and sex discrimination. *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 324 (2d Cir.1983); *Spence v. Maryland Casualty Company*, 995 F.2d 1147, 1155 (2d Cir.1993).

■ We believe that O'Keefe has, under law to which this Court must be responsive on a motion such as this, barely made out a prima facie case of discrimination. As for the first three factors, she was terminated at the age of 58, she has provided evidence of good performance ratings and promotions, and she was terminated. As for the fourth factor, O'Keefe has provided several examples which lead a jury to infer that General Accident discriminated against women and/or older individuals. When O'Keefe complained to Pomara about McLaughlin's behavior, he told her that she could "live with that." He also told her that some women at General Accident were more interested in finding a partner than they were in their work. Other male employees remarked that some women wore "revealing" clothing. O'Keefe also contends that on one occasion a female co-worker entered McLaughlin's office to discuss a problem she was having with an agent when McLaughlin asked, "You're not going to cry?" Moreover, O'Keefe asserts that another "older" employee, Joan Zabonik, was treated poorly. In light of these examples, we believe that O'Keefe has made out a prima facie case of discrimination.

### 2. Legitimate Reasons for the Termination

■ Once O'Keefe has established a prima facie case of either age or gender discrimination, the burden then shifts to the Defendant to produce evidence that the plaintiff was terminated for legitimate nondiscriminatory reasons. See *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; *Martin v. Citibank N.A.*, 762 F.2d 212 (1985). General Accident contends that O'Keefe's performance was unacceptable.

For example, on July 2, 1991 O'Keefe was evaluated and earned an overall performance level of "2" indicating her performance was below appropriate standards and needed to be improved. A letter dated October 11, 1991 from O'Keefe's immediate supervisor to McLaughlin reports the continued errors in O'Keefe's performance and advised that McLaughlin should give O'Keefe a verbal warning. A letter was also given to O'Keefe which further explained the oral reprimand she was given. Finally, O'Keefe was given a Disciplinary Action Notice on January 3, 1992 which demanded an improvement in performance within 30 days.

### 3. Pretextual Reasons

■ Once General Accident produces its legitimate nondiscriminatory reason for its action, the burden of proof shifts back to O'Keefe to prove by a preponderance of the evidence that the proffered reasons are merely pretextual and that she has been the victim of intentional discrimination. See *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; see also *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. at 506–07, 113 S.Ct. at 2747–48. O'Keefe claims that her inability to raise her performance level was due to improper training and a lack of supervision. McLaughlin obstructed her progress with General Accident by refusing to answer her questions and by assisting other employees at the company. Moreover, upon first starting with General Accident, the company did not provide O'Keefe with training, informal or formal, whereas other employees were given informal training on company time. Finally, for over a year, the supervisory and managerial positions were vacant. During that time, O'Keefe did not have an immediate supervisor in the department. In light of these contentions, the court finds that an issue of fact—albeit a thin one— exists as to whether General Accident's proffered reasons for terminating O'Keefe are merely pretextual. Accordingly, O'Keefe may proceed on her Title VII and ADEA claims.

### C. O'Keefe's State Claims

 In addition to her federal claims, O'Keefe also asserts claims for age discrimination, sex discrimination and retaliation under New York's Human Rights Law. General Accident argues that this Court does not possess jurisdiction over the state law claims because she elected to pursue those claims in a state administrative forum. See *Keeley v. Citibank N.A.*, 711 F.Supp. 157, 161 (S.D.N.Y.1989). O'Keefe has provided us with no argument to the contrary. Regardless of whether this Court technically possesses jurisdiction over O'Keefe's state claims, however, it is an open question whether the Court should exercise its discretion and retain jurisdiction over this pendent state cause of action. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–28, 86 S.Ct. 1130, 1138–40, 16 L.Ed.2d 218 (1966).

Our Court of Appeals is silent on the issue of whether a plaintiff may commence both an ADEA claim and an age discrimination claim based on New York Human Rights Law in federal court. Moreover, the district courts are split on this issue. Some courts have viewed the state claims as appropriate complimentary claims and have retained jurisdiction. See *Kaczor v. City of Buffalo*, 657 F.Supp. 441 (W.D.N.Y.1987); *Selbst v. Touche Ross and Co.*, 587 F.Supp. 1015 (S.D.N.Y.1984). However, other courts have viewed the state claim as confusing for the jury. See *Realmuto v. Yellow Freight System Inc.*, 712 F.Supp. 287, 291 (E.D.N.Y. 1989); *Burger v. Health Insurance Plan of Greater New York*, 684 F.Supp. 46, 50 n. 4 (S.D.N.Y.1988). Moreover, several courts have refused to retain jurisdiction on the theory that if plaintiffs knew that they could combine a federal ADEA claim which does not permit compensatory damages with a New York claim which does permit them, there would be little incentive for them to settle during the EEOC conciliation process. See *Lippa v. General Motors*, 760 F.Supp. 1062, 1065 (W.D.N.Y.1990); *Giuffre v. Metropolitan Life Insurance Co.*, 129 F.R.D. 71, 79 (S.D.N.Y.1989); *Realmuto*, 712 F.Supp. at 291. Accordingly, the court declines to retain pendent jurisdiction.

### CONCLUSION

For the reasons stated, the Court denies General Accident's motion for summary judgment as to O'Keefe's federal claims under Title VII and the ADEA and grants summary judgment as to her state claims.

**SO ORDERED.**