**Stephanie JONES, Plaintiff,**

v.

**ENTERPRISE RENT A CAR COMPANY OF TEXAS, Enterprise Leasing Company of Houston, and Enterprise Rent a Car Company, Defendants.**

**No. G–01–613.**

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 11, 2002.

As Amended March 18, 2002.

---

Brian R Pollard, Baker Hancock & Pollard, Waco, TX, for plaintiff.

J Clifford Gunter, III, Bracewell & Patterson, Houston, TX, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S RICO CLAIMS

KENT, District Judge.

Plaintiff Stephanie Jones ("Jones") brings this lawsuit against Defendants Enterprise Rent a Car Company of Texas ("Enterprise (San Antonio)"), Enterprise Leasing Company of Houston ("Enterprise (Houston)"), and Enterprise Rent a Car Company ("Enterprise") alleging causes of action for wrongful termination, various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, sex discrimination, pregnancy discrimination, sexual harassment, retaliation, and intentional infliction of emotional distress. Now before the Court is Defendants' Motion to Dismiss Plaintiff's RICO claims. For the reasons articulated below, Defendants' Motion is hereby **GRANTED**.

## I. BACKGROUND

Since Defendants' Motion is brought pursuant to Fed.R.Civ.P. 12(b)(6), the Court refrains from any subjective analysis of Plaintiff's credibility, and presents the facts, however seemingly fantastic, exactly as averred by Plaintiff in her Amended Complaint. In February of 1997, Jones was hired by Enterprise to work as an account executive for Enterprise (San Antonio) in Corpus Christi, Texas. Jones' duties primarily consisted of selling Enterprise's fleet automobiles to the general public. In facilitating these sales, Jones and other Enterprise employees would procure loan applications from prospective buyers and forward these documents to lenders. If applicants were pre-approved for credit based on their favorable "beacon scores" and annual incomes, lenders would automatically advance money to Enterprise to finance these purchases. Otherwise, lenders would require a more thorough in-house processing and review of these applications. Throughout her employment at Enterprise (San Antonio), Jones claims that she was ordered by her superiors to misreport vehicle identification numbers ("VINs"), alter beacon scores, and inflate customer incomes in order to defraud lenders into financing, and sometimes, overfinancing, automobile purchases. Specifically, Jones alleges that on or about November 6, 1997, her supervisor, Daniel Enriquez ("Enriquez"), threatened to discharge her if she did not perform these illegal acts. Then, on November 11, 1997, Enriquez instructed Jones to modify a beacon score on a potential buyer's credit report or else "be fired." After refusing to heed Enriquez' directives in both instances, Jones reported these events to the appropriate persons at Enterprise, thereby prompting an investigation by both Enterprise (San Antonio) and Enterprise. On or about December 11, 1997, Enterprise (San Antonio) employees, unaware that Jones had blown the whistle on their practices, conspired in Jones' presence to escape blame and "get" the person responsible for reporting these activities. The Enterprise investigation resulted in several firings and a reprimand for Steve Bressler ("Bressler"), a coconspirator and Jones' future supervisor.

Following these incidents, Jones was reassigned to work for Enterprise (Houston) in Houston, Texas in February of 1998. Approximately six months later, Bressler was promoted to a branch manager position at Enterprise (Houston) directly overseeing Jones. In September of

1998, after discovering that Jones had been the whistleblower a year earlier, Bressler began making inappropriate comments about Jones' body, and offering to let Jones off work early if she would give him back rubs and massages. Bressler also stated that Jones, as a woman, would never be promoted by Enterprise once she had children. In February of 1999, Enterprise (Houston) promoted Jones to the position of business finance manager, still under Bressler's supervision. According to Jones, Bressler continued his harassment by enticing her to work late with him, disclosing to her unsolicited information about his sex life, and making lewd and suggestive jokes to her and other co-workers. In June of 1999, following an Enterprise seminar on sexual harassment in the workplace, Jones filed an internal sexual harassment complaint against Bressler. One month later, Jones was transferred to the remarketing division, out of Bressler's direct chain of command. In her new position, Jones was charged with selling Enterprise vehicles to other car rental companies and wholesale car dealers. Jones' new supervisor, Thai Phamm ("Phamm"), complained about Jones' transfer because of the previous sexual harassment complaint. In December of 1999, Jones informed the regional remarketing supervisor for Enterprise (Houston), Dan Quintana ("Quintana"), that she had been the whistleblower in 1997. Quintana subsequently issued an "unsatisfactory" work review for Jones, which was later upgraded to "needs improvement" at Jones' urging.

In February of 2000, Thane Russey ("Russey") became Jones' new supervisor. Russey told Jones to either "sell or quit" and that he was there "to get rid of her." Under Russey's command, Jones alleges that she was instructed to engage in a fraudulent car substitution scheme, whereby Enterprise would sell a particu-

lar vehicle to a customer, but then deliver a lesser-valued car to that customer. The original vehicle would usually be sold at a higher price to another buyer. Jones avers several instances where Russey asked her to facilitate this scheme. On June 15, 2000, Russey ordered Jones to misrepresent a van as being hail-damaged to a customer who had already bought the vehicle so that the vehicle could be sold to another person at a higher price. After Jones refused, Russey stated that if she could not be a "team player," then "she could not be on the team." On September 22, 2000, Russey directed Jones to substitute several Buick Century automobiles that had been sold to Thrifty Car Rental with lower quality vehicles bearing different specifications. Although Russey again threatened her employment, Jones refused to comply. On October 6, 2000, Russey instructed Jones to switch six Nissan Maxima vehicles with lower quality models. Jones again refused, under explicit threat of being fired. Enterprise (Houston) and Enterprise later conducted an investigation into these matters, and Jones was accused of participating in the scheme.

Yet another scheme alleged by Jones is "ghost selling," a practice in which Enterprise employees would document fictitious car sales to existing customers in order to satisfy company quotas. Lenders would advance funds to finance these fabricated sales, and subsequently charge interest and finance charges to the unsuspecting customers. Regarding this scheme, Jones claims that on October 14, 2000, Russey ordered her to ghost sell a 2000 Dodge Neon, a 2000 Ford Taurus, and a 2000 Chevrolet Malibu, or else "be fired." Jones refused. On October 30, 2000, Jones was promoted to the position of senior remarketing supervisor for Enterprise (Houston). The next day, Jones re-

ported to Enterprise (Houston) that she was pregnant with her first child. Jones' maternity leave would prevent her from working during the "big pull," the period of intense sales at Enterprise (Houston). On November 3, 2000, Jones inquired about maternity leave benefits, and shortly thereafter was suspended with pay pending a "new investigation" initiated by Enterprise (Houston) and Enterprise. On November 6, 2000, Jones filed a sexual discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") alleging pregnancy discrimination. On November 10, 2000, Enterprise (Houston) and Enterprise investigated Jones on the basis of "ethical questions." Jones denied involvement in any unethical dealings and informed investigators of the "ghost sales." On November 16, 2000, Jones was fired for the stated reason that she had misrepresented a vehicle as having four-wheel drive to a customer. Jones contends that the stated justification was pretextual, since other Enterprise employees had not been discharged for making similar mistakes. On October 9, 2001, Jones filed this lawsuit, specifically alleging causes of action for wrongful termination, RICO violations, sex discrimination, pregnancy discrimination, sexual harassment, retaliation, and intentional infliction of emotional distress. On December 14, 2001, Defendants filed a Motion to Dismiss Plaintiff's RICO Claims, to which the Court now turns.

## II. LEGAL STANDARD

Defendants move to dismiss this suit pursuant to Fed.R.Civ.P. 12(b)(6). A party is entitled to dismissal under Fed. R.Civ.P. 12(b)(6) when an opposing party fails to state a claim upon which relief may be granted. When considering a 12(b)(6) motion, the Court accepts as true all well-pleaded allegations in the complaint, and views them in a light most favorable to the plaintiff. *See Malina v. Gonzales,* 994 F.2d 1121, 1125 (5th Cir.1993). "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993).

Unlike a motion for summary judgment, a motion to dismiss should be granted only when it appears without a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998) (applying the standard in the context of Rule 12(b)(1)); *Home Capital Collateral, Inc. v. FDIC,* 96 F.3d 760, 764 (5th Cir.1996); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994) (both applying the standard in the context of Rule 12(b)(6)). The Fifth Circuit has noted that dismissal for failure to state a claim is disfavored and will be appropriate only in rare circumstances. *See Mahone v. Addicks Util. Dist. of Harris County,* 836 F.2d 921, 926 (5th Cir. 1988).

## III. STANDING UNDER RICO

Plaintiff avers that Defendants violated RICO's four main criminal and civil liability provisions, as set forth in 18 U.S.C. § 1962. First, Plaintiff alleges that Defendants violated 18 U.S.C. § 1962(a), which makes it unlawful for any person to use or invest income derived from a pattern of racketeering activity towards the acquisition, establishment, or operation of an enterprise engaged in or affecting interstate commerce. Second, Plaintiff claims that Defendants acquired or maintained an interest in an enterprise engaged in or affecting interstate commerce through a pattern of racketeering activity, as expressly prohibited by 18 U.S.C. § 1962(b). Third,

Plaintiff argues that Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of an enterprise engaged in or affecting interstate commerce through a pattern of racketeering activity. Finally, Plaintiff maintains that Defendants conspired to violate 18 U.S.C. §§ 1962(a)-(c), also prohibited by RICO under 18 U.S.C. § 1962(d).

To support her various RICO claims, Plaintiff states that Defendants Enterprise (San Antonio), Enterprise (Houston), and Enterprise constituted an "association in fact" that became an "enterprise" engaged in or affecting interstate commerce through the business of buying, selling, and leasing cars. Plaintiff further claims that through the execution of various types of racketeering activity used to bolster and conduct the activities of the enterprise, Defendants violated the provisions of 18 U.S.C. §§ 1962(a)-(d). Specifically, Plaintiff identifies several different types of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), each comprising a distinct predicate act falling within the purview of RICO.[1] First, Plaintiff contends that the numerous instances of Defendants modifying customer credit reports, substituting vehicles upon delivery, and ghost selling, constituted RICO predicate acts in violation of federal statutes governing wire fraud, 18 U.S.C. § 1343; mail fraud, 18 U.S.C. § 1341; and financial institution fraud, 18 U.S.C. § 1344. Furthermore, and particularly relevant to Defendants' Motion to Dismiss, Plaintiff claims that Defendants extorted her in violation of the Hobbs Act, 18 U.S.C. § 1951(a), specifically referencing the several occasions where Enterprise supervisors threatened to discharge her unless she participated in the fraudulent schemes. A violation of the Hobbs Act is similarly enumerated as a "racketeering activity" under § 1961(1). These various predicate acts, according to Plaintiff, form at least one "pattern of racketeering activity" under RICO, and therefore give rise to civil RICO liability.[2]

Defendants' Motion to Dismiss is premised on the solitary argument that Plaintiff

---

1. RICO defines "racketeering activity" as any offense listed in 18 U.S.C. § 1961(1). These offenses are often referred to as "predicate acts," and primarily include crimes indictable under federal law, although a lesser number are punishable under state law.

2. In her Amended Complaint, Jones implies that Defendants engaged in more than one pattern of racketeering activity. Principally, Jones divides her allegations into two separate RICO schemes—the first involving acts of mail, wire, and bank fraud; and the second involving the six incidents of Hobbs Act extortion. Regardless, the Court queries as to whether or not Jones can demonstrate even a single "pattern of racketeering activity" under § 1962. The Supreme Court has held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). With regard the relatedness element, the Supreme Court has opined that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or method of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.*, 492 U.S. at 240, 109 S.Ct. at 2901 (citing 18 U.S.C. § 3575(e)). Here, Plaintiff alleges several different RICO predicate acts, committed by three separate actors, in the pursuit of effectuating three distinct fraudulent schemes. As such, the most notable link between these incidents appears to be an affiliation with Enterprise and Jones, making this Court wonder whether these acts are sufficiently related to form a pattern of racketeering activity at all. The Court has similar doubts regarding Plaintiff's ability to demonstrate the requisite threat of continuity of these acts. Despite these concerns, however, in light of the early stage of this litigation, and because Defendants do not raise these arguments in their Motion, the Court reserves judgment on these issues for a later date.

lacks standing to bring a cause of action under RICO. Defendants cite two recent cases in support of this proposition, *Cullom v. Hibernia National Bank*, 859 F.2d 1211 (5th Cir.1988), and *Beck v. Prupis*, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). Defendants maintain that the instant case is clear-cut since *Cullom* and *Beck* both unequivocally hold that an employee discharged for refusing to participate in an illegal activity under RICO lacks standing to sue under 18 U.S.C. § 1964(c). Plaintiff, evidently aware that the courts have overwhelmingly denied RICO standing to wrongfully discharged employees, does not even attempt in her Response to assert standing on the basis of Defendants' alleged wire, mail, or financial institution fraud. Instead, Plaintiff ostensibly tries to plead her way around the *Cullom* and *Beck* line of cases by arguing that Defendants' acts of extortion *directly* targeted and injured her, thereby conferring standing under RICO. Although the Court commends Plaintiff's vigorous and artful pleadings, it concludes that Plaintiff's case is not materially distinguishable from *Cullom* and *Beck*, and that Plaintiff therefore does not possess standing to bring claims under RICO.

## A. § 1964(c)

The right to maintain a private RICO action and recover treble damages and attorney's fees extends to "[a]ny person injured in his business or property *by reason of a violation of section 1962 ...*" 18 U.S.C. § 1964(c) (emphasis added). Accordingly, a RICO plaintiff must demonstrate both injury and causation. *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Although the meaning of the "by reason of" language is not entirely clear, the Supreme Court has established that a plaintiff's injury must be proximately caused by the RICO violative acts, such that "the

plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.*, 473 U.S. at 496, 105 S.Ct. at 3285. Principally, "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." *Id.*, 473 U.S. at 497, 105 S.Ct. at 3285 (citing *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (quotations omitted)). Rather, "[a]ny recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts." *Id.* (footnote omitted). Thus, the Plaintiff can only recover for injuries *proximately* caused by a pattern of racketeering activity violating Section 1962 or by individual RICO predicate acts. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990) (citations omitted). A RICO pattern or predicate acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence. *Id.* at 23–24.

## B. Fraud Allegations

The Court first addresses the question of standing relative to Plaintiff's allegations that Defendants committed wire fraud, mail fraud, and financial institution fraud in violation of RICO. Innumerable courts, including the Fifth Circuit and the United States Supreme Court, have held that employees who are discharged for reporting or refusing to participate in a pattern of racketeering activity do not have standing to sue their employers under 18 U.S.C. § 1964(c). In each of these

cases, the courts concluded that the injuries flowing from the employer's retaliatory conduct were not sufficiently proximate to the alleged RICO violations to confer standing upon the employee. *See, e.g., Beck*, 529 U.S. at 505, 120 S.Ct. at 1616 (no standing under § 1964(c) for a violation of § 1962(d) for a president and CEO allegedly terminated for reporting misconduct of officers and directors to regulators); *Hecht*, 897 F.2d at 24 (no standing for employee claiming loss of employment for refusing to cooperate in employer's mail and wire fraud scheme); *Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989) (per curiam) (no standing for stockbroker who was allegedly fired and lost client base for complaining about employer's acts of mail fraud and securities fraud); *Cullom*, 859 F.2d at 1216 (no standing for employee constructively discharged for refusing to participate in fraudulent loan transactions); *Nodine v. Textron, Inc.*, 819 F.2d 347, 348–49 (1st Cir.1987) (no standing for employee fired for registering objections to employer's customs law violations).

In *Cullom*, for example, the plaintiff claimed his employer created a fraudulent scheme to sell short term participations in its loan portfolio. 859 F.2d at 1212. After becoming suspicious of particular transactions, Cullom sought the advice of independent legal counsel and ultimately refused to participate in the racketeering activity. Thereafter, Cullom was told "not to make waves" and to dispose of any circulars and written communications distributed by the company. Cullom was later asked to resign for refusing to participate in the loan participation purchases and for seeking the advice of independent legal counsel. *Id.* at 1213. Analogizing the case to that of a wrongfully discharged whistle blower, the Fifth Circuit held that Cullom lacked standing to bring a cause of action under RICO because "the acts which injured Cullom were not caused by the predicate acts that Cullom alleged in his complaint within the meaning of *Sedima's* causation requirement." *Id.* at 1215. In short, Cullom's injuries were not proximately caused by the commission of the fraudulent loan scheme, but rather, his employer's decision to constructively discharge him. As such, Cullom did not have standing to recover treble damages under § 1964(c).

The Supreme Court reinforced *Cullom's* holding in the context of a RICO claim brought under 18 U.S.C. § 1962(d). In *Beck*, the plaintiff was the president and CEO of a corporation in which certain directors and officers began engaging and conspiring to engage in acts of racketeering. Shortly after reporting the unlawful conduct to regulators, Beck was fired. 529 U.S. at 498, 120 S.Ct. at 1612. The Supreme Court concluded that Beck lacked standing to bring his RICO claim because his injury was caused by an overt act, rather than an act of racketeering or an act otherwise prohibited by RICO. The *Beck* court explained that "consistency with the common law requires that a RICO conspiracy plaintiff allege injury from an act that is analogous to an 'ac[t] of a tortious character.'" *Id.*, 529 U.S. at 505, 120 S.Ct. at 1615 (citations omitted). Because the termination of Beck's employment was proximately caused by an overt act, not an act of racketeering, Beck could not sue the defendants under RICO's conspiracy provision.

A host of other federal appellate courts have issued identical holdings in employee discharge cases. In *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990), the plaintiff claimed that he lost commissions and was discharged for refusing to aid in the concealment of his employer's frauds upon company customers. *Id.* at 22. In rejecting the plaintiff's argument on standing, the Second Circuit rea-

soned that "[b]ecause Hecht was 'neither the target of the racketeering enterprise nor the competitor[ ] nor the customer [ ] of the racketeer[s], the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not reasonably foreseeable as a natural consequence of the RICO violations." *Id.* at 24. Moreover, "[b]ecause the overt act of Hecht's discharge was not a section 1961(1) predicate act," his loss of employment also did not confer civil standing. *Id.* at 25. The First Circuit embraced similar concepts in *Nodine v. Textron, Inc.,* 819 F.2d 347 (1st Cir.1987). In *Nodine,* the plaintiff argued that his wrongful termination was a direct result of his employer's attempts to conceal the illegal acts of mail and wire fraud by committing acts of obstruction of justice and obstruction of a criminal investigation. *Id.* at 347–48. In finding that Nodine lacked standing to assert his claims under RICO, the court expounded: "None of these alleged offenses harmed Nodine in his business or property. His injury resulted from Textron's decision to fire him after he reported the customs scheme to his superiors. Firing Nodine under these circumstances was wrong, but it did not violate the RICO act." *Id.* at 349.

■ Applying the clear edicts of the *Cullom* and *Beck* line of cases, Plaintiff in the instant case does not have standing to bring a RICO cause of action on the basis of Defendants' alleged acts of wire fraud, mail fraud, and financial institution fraud. Jones' stated injury, her loss of employment, may have been *factually* caused by Defendants' fraudulent activities, but it was not *proximately* caused by any of these schemes. Instead, in modifying customer credit reports, and in effecting fraudulent car substitutions and ghost selling, Defendants were solely attempting to defraud lenders and customers, *not* target Plaintiff's job. Any proximate injuries resulting from these schemes, then, fell upon Enterprise's lenders and customers, *not* Plaintiff; and any association between Plaintiff's injury and Defendants' RICO violations was much too attenuated to support a finding of standing. On this rather unambiguous point of law, and because Jones does not argue otherwise in her Response, the Court, without hesitation, **DISMISSES WITH PREJUDICE** any and all of Plaintiff's RICO claims premised upon Defendants' commission of wire fraud, mail fraud, and financial institution fraud.

## C. Hobbs Act Extortion

Although the determination of standing is straightforward in the context of Plaintiff's fraud allegations, the much more perplexing issue raised by this case, and an apparent question of first impression in this jurisdiction, is whether or not Plaintiff's allegations of extortion under the Hobbs Act are sufficient to confer standing under § 1964(c).[3] Plaintiff claims that Defendants extorted her on several occasions by threatening to discharge her unless she participated in fraudulent activities. In a thinly veiled effort to avoid the consequences of *Cullom* and *Beck,* Plaintiff adamantly attempts to distinguish her case from other "refusal to cooperate" cases. Plaintiff suggests that unlike Defendants' alleged acts of mail, wire, and bank fraud, Defendants' Hobbs Act scheme was directly targeted at her, such that her resulting injury was proximately caused by these acts of attempted extortion. In dissecting this novel, but wholly untenable, issue of

**3.** Again, here the Court considers only Fed. R.Civ.P. 12(b)(6) dismissal, and thus must accept Plaintiff's factual allegations as truthful.

The Court therefore must leave credibility assessment for another day.

law, the Court examines the Hobbs Act, as well as similarly situated cases arising in other jurisdictions.

 The Hobbs Act states in pertinent part that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). The term "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). In the case at hand, Defendants do not challenge Jones' assertion of a Hobbs Act violation, and the Court finds (ignoring credibility) that Plaintiff has made out a prima facie case for extortion. As Plaintiff points out, the term "property" for the purposes of Hobbs Act liability refers to both tangible and intangible property, including job rights and the right to conduct a business. *See, e.g., Nat'l Org. for Women v. Scheidler,* 510 U.S. 249, 254, 114 S.Ct. 798, 802, 127 L.Ed.2d 99 (1994) (finding an injury to business or property under the Hobbs Act where anti-abortion protesters "conspired to use threatened or actual force, violence, or fear to induce abortion clinic employees, doctors, and patients to give up their jobs, give up their economic right to practice medicine, and give up their right to obtain medical services at clinics"). Some courts have applied this principle in the context of at-will employment. *Hunt v. Weatherbee,* 626 F.Supp. 1097, 1103 (D.Mass.1986) (declaring that plaintiff could sue employer for Hobbs Act violations based upon plain-

tiff's loss of employment and future job prospects as a journeyman); *Sharpe v. Kelley,* 835 F.Supp. 33, 34 (D.Mass.1993) (upholding plaintiff's Hobbs Act claim where defendant employer tried to extort sexual favors from plaintiff by threatening her "contractual job rights and partnership rights"). *But see, Cardwell v. Sears Roebuck & Co.,* 821 F.Supp. 406, 408 (D.S.C. 1993) (questioning the view that a discharged employee may bring an extortion action against his employer since "[t]he threat of being fired is forever present for the at-will employee"). At this stage in the litigation, the Court is obliged to accept as true all well-pleaded allegations in Plaintiff's Amended Complaint and construe them in a light most favorable to Plaintiff. Here, Jones avers several instances in which Enterprise supervisors explicitly threatened to discharge her unless she cooperated in their fraudulent schemes. Because Plaintiff's job is most likely "property" under the Hobbs Act, and assuming (as the Court must for now) that Plaintiff can prove the truth of these allegations, the Court finds that these incidents do give rise to a valid prima facie claim for Hobbs Act extortion.

 Having established a valid claim for Hobbs Act extortion, Jones now faces a much more formidable obstacle—namely, overcoming the mountain of jurisprudence that denies RICO standing to employees who are discharged for reporting or refusing to cooperate in RICO prohibitive activities. In pursuit of this goal, Jones characterizes her action as an exception to the typical "refusal to cooperate" cases. Unlike other wrongful discharge claims lassoed into the RICO context solely on the "refusal to cooperate" basis, Jones maintains that her injuries were proximately caused by RICO predicate acts entirely independent of Defendants' fraudulent schemes (i.e., the six alleged incidents of

attempted Hobbs Act extortion), thereby invoking standing under § 1964(c). Although the Fifth Circuit has never treated this particular, microscopically nuanced issue, a handful of federal district courts have addressed this question. Based upon this Court's reading of the *Cullom* and *Beck* line of cases, and drawing upon the reasoning of other district courts in like cases, the Court firmly concludes that Plaintiff lacks standing to assert RICO claims based upon Defendants' acts of Hobbs Act extortion.

In previous employee discharge cases, the appellate courts have occasionally hinted at the idea that a plaintiff could recover under § 1964(c) for a loss of employment that was directly caused by a RICO scheme. In *Nodine*, for example, the plaintiff claimed that he was discharged for refusing to disavow knowledge of his employer's RICO violations, rather than for refusing to cooperate in the alleged scheme. This conduct, according to the plaintiff, amounted to an obstruction of a criminal investigation by bribery under 18 U.S.C. § 1510, also a predicate offense under RICO. 819 F.2d 347. The First Circuit in that case acknowledged in a footnote that "Nodine's allegation of obstruction of a criminal investigation comes closest to satisfying the injury requirement imposed by *Sedima*." *Id.* at 349 n. 3. However, the *Nodine* court declined to find standing on this basis, noting that the plaintiff had earlier waived the argument. *Id.* Years later, in *Miranda v. Ponce Federal Bank*, 948 F.2d 41 (1st Cir.1991), the First Circuit again confronted the issue raised in *Nodine*. The court in *Miranda* recognized that the plaintiff was "plainly laboring" to bring her claim within the confines of the *Nodine* dictum "[b]y recasting her RICO claim on the fundament of a scheme to obstruct justice instead of resting it on the money laundering scheme." *Id.* at 47.

Although the First Circuit observed that it had "at one time left open the possibility that a different result might inure if the firing occurred as a direct result of an obstruction-of-justice," it ultimately denied standing to Miranda because she "was fired not as a means of obstructing justice, but in retaliation for her refusal to facilitate the cover-up." *Id.* In other appellate cases, and of particular relevance to the instant lawsuit, the plaintiffs alleged the elements of extortion without actually pleading a Hobbs Act violation. The plaintiff in *Cullom*, for example, was instructed "not to make waves" with his employer, 859 F.2d at 1213, while the employee in *Hecht* was told "that he must either cooperate with the concealment of these frauds or lose his job," 897 F.2d at 22. Although the discharged employees in *Cullom* and *Hecht* were arguably extorted by their employers, neither plaintiff averred a violation of the Hobbs Act, and consequently, neither court addressed the specific question of whether allegations of Hobbs Act extortion might confer § 1964(c) standing upon a wrongfully discharged employee.

Notwithstanding the limited guidance emanating from the appellate courts, several district courts have squarely confronted the precise issue raised here. *See, e.g., Mruz v. Caring, Inc.,* 991 F.Supp. 701 (D.N.J.1998) (in the context of witness tampering and retaliation against a witness); *J.S. Serv. Center Corp. v. Gen. Elec. Technical Services Co., Inc.,* 937 F.Supp. 216 (S.D.N.Y.1996) (in the context of bribery and extortion); *Cardwell v. Sears Roebuck and Company,* 821 F.Supp. 406 (D.S.C.1993) (in the context of Hobbs Act extortion); *Dooley v. United Technologies Corp.,* No. CIV.A. 91–2499, 1992 WL 167053 (D.D.C. June 17, 1992) (in the context of obstruction of justice); *Haviland v. J. Aron & Co.,* 796 F.Supp. 95 (S.D.N.Y.

1992) (in the context of Hobbs Act extortion). In these cases, a portion of the courts have continued to deny standing to wrongfully discharged employees for lack of proximate cause. *See, e.g., J.S. Service Center,* 937 F.Supp. at 223 (concluding that plaintiff's injury was not a proximate result of the predicate acts of bribery, extortion, mail fraud, or wire fraud); *Cardwell,* 821 F.Supp. at 409 (finding no "direct relationship" between the injury asserted and the illegal conduct alleged because "even if Sears did target Caldwell with its extortion, its ultimate purpose was to defraud its customers"); *Haviland,* 796 F.Supp. at 101 ("[W]e find Haviland's allegation that he was penalized for refusing to yield to an attempted extortion to be indistinguishable from other employees' claims that they were penalized for refusing to join in an unlawful scheme."). Other courts have recognized and applied an exception to the typical no-standing rule. *See, e.g., Mruz,* 991 F.Supp. at 712–13 ("It cannot be that those who conduct an enterprise's affairs by engaging in a pattern of racketeering activity which ultimately causes an employee's termination can escape liability under RICO."); *Dooley,* 1992 WL 167053, at *4–5 ("Where the obstruction of justice offense is committed as part of the pattern of racketeering activity, an employee's demotion or firing becomes part of the compensable harm of the defendant's RICO violation.").

Within this corpus of cases, the Court finds two opinions particularly instructive, *Haviland v. J. Aron Co.,* 796 F.Supp. 95 (S.D.N.Y.1992), and *Mruz v. Caring, Inc.,* 991 F.Supp. 701 (D.N.J.1998). In *Haviland,* the discharged employee alleged facts virtually identical to those in the instant case. Specifically, Haviland averred that his employer attempted to extort him on eight separate occasions into divulging confidential client information in furtherance of a fraudulent scheme. 796

F.Supp. at 96. When Haviland refused to participate in the scheme, he was denied appropriate salary increases and ultimately terminated. *Id.* at 97. Following these events, Haviland sued his employer under two provisions of RICO, alleging predicate acts in the form of mail and wire fraud, as well as attempted extortion in violation of the Hobbs Act. In applying § 1964(c), the district court first assessed Haviland's standing in the context of the mail and wire fraud allegations. After summarizing the long list of appellate authority denying standing to plaintiffs in such instances, the court found that Haviland lacked standing to bring these particular RICO claims. *Id.* at 100–01. However, with regard to Haviland's Hobbs Act allegations, the inquiry was much more complex. Haviland attempted to argue that the Hobbs Act scheme was directed *at him* and that his resulting injuries were therefore sufficiently proximate to confer standing under RICO. Despite Haviland's artful pleadings, however, the district court rejected this argument. The court determined that Haviland's case was indistinguishable from other "refusal to cooperate" cases since Haviland's injuries were not attributable to the acts of attempted extortion, but "to his refusal to participate in the allegedly fraudulent scheme." *Id.* at 101. "In short, the difficulty we have with crediting Haviland's assertion that the Hobbs Act allegations distinguish his case from the *Hecht* cases is that every one of the latter cases could also have been pled in this manner." *Id.* The court further stated that although Haviland's claims were "drafted in a conscious attempt to plead around the 'refusal to cooperate' cases," these creative pleadings could not "disguise the fact that the intended victims of the alleged scheme to defraud and attempted extortion were [his employer's] clients, and that any injury Haviland suf-

fered resulted from his refusal to accede to the scheme rather than the racketeering activity itself." *Id.* at 102. On these grounds, the court concluded that Haviland's injuries were "too remote from the RICO violations to be deemed 'proximate,'" thereby stripping Haviland of any standing to bring causes of action under RICO. *Id.*

The court in *Mruz* addressed a similar question, but reached an entirely disparate result. In *Mruz*, the plaintiff alleged that he was terminated for blowing the whistle on his employer's Medicaid and tax fraud. 991 F.Supp. at 704–07. Unlike other whistle blower cases brought pursuant to RICO, however, Mruz claimed that his job loss was a direct result of his employer's attempt to tamper with a witness, a predicate act under RICO. *Id.* The *Mruz* court concurred with the plaintiff's analysis on standing, noting that several courts had recognized an exception to the no-standing rule in "refusal to cooperate" actions. In rebuking the notion that "wrongful terminations are somehow a different kind of injury," the *Mruz* court stated that "[t]here does not appear to be caselaw which carves out one parcel of potential injuries—employment related ones—for treatment substantially different than other injuries to a plaintiff's business or property; the fact that racketeering activity under RICO results in job loss does not transmogrify the racketeering into something else." *Id.* at 712–13. Based on this reasoning, and its determination that Mruz's injury was proximately caused by an act of witness tampering, the court held that Mruz possessed standing to maintain an action under RICO. *Id.* at 714–15.

In the instant case, Jones employs the same strategy as the plaintiffs in both *Haviland* and *Mruz*. Specifically, Jones contends that her injury was *directly* caused by a RICO predicate act in the form of Hobbs Act extortion. Although the Court is genuinely impressed by Plaintiff's dedicated effort to bring herself within RICO's standing provision, it finds itself compelled to agree with the *Haviland* court that Plaintiff's case is not distinguishable from other "refusal to cooperate" actions, and that Plaintiff therefore does not have standing to bring claims under RICO.

Primarily, Jones argues that her loss of employment was proximately caused by Defendants' acts of Hobbs Acts extortion. However, her own Amended Complaint belies the truth of this assertion. Jones herself pleads that "Defendants, as retribution for her refusal to commit crimes, facilitated Plaintiff's firing and/or constructive discharge," and that "[f]or the sole reason that Plaintiff refused to perform these criminal acts, Enterprise (San Antonio) and Enterprise (Houston), their agents, servants and employees, conspired to subject and did subject Plaintiff to ... ultimate firing and/or constructive discharge." (Pl.'s Am. Compl. ¶¶ 37, 39.) By Jones' own admission, then, her loss of employment—indeed, her loss of property—was caused *not* by Defendants' acts of attempted extortion, but by Defendants' decision to fire her for refusing to participate in the fraudulent schemes, which is not a RICO predicate act. As in other "refusal to cooperate" cases, then, Plaintiff's loss of employment may have been an unfortunate byproduct of Defendants' fraudulent and extortionate conduct, but it is inconceivable that Plaintiff was the intended target of Defendants' schemes. *See, e.g., Giuffre v. Metropolitan Life Ins.*, 129 F.R.D. 71, 75 (S.D.N.Y.1989) (refusing to accept that defendant established "a nationwide fraudulent scheme for the sole purpose of firing [the plaintiff] ...."). Rather, the facts in the record clearly demonstrate that Defendants' entire pattern of racketeering activity, as effected through the commission of

mail fraud, wire fraud, bank fraud, *and* extortion, was aimed *solely* at pilfering profits from Enterprise customers and lenders, such that any proximate injuries flowing from Defendants' conduct fell exclusively upon the backs of such customers and lenders. Jones may have been an extraneous and incidental victim of her employers' illegal acts, but she was *never* Defendants' intended prey. Like the plaintiff in *Haviland*, then, Jones has not alleged a cause of action that is in any way materially distinct from other "refusal to cooperate" cases.

Furthermore, it is the duty of this Court, and all courts of law, to discern the truth from the facts as alleged by the parties, and not to be beguiled by conclusory allegations posing as facts. *See Cardwell*, 821 F.Supp. at 409 (citations omitted). While this Court is bound to accept as true all well-pleaded facts in Plaintiff's Complaint, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993). *See also Haviland*, 796 F.Supp. at 101 ("While we are mindful of our obligation to assume the truth of Haviland's *factual* allegations on a motion to dismiss, we need not credit his legal conclusions or the labels he has selected for the predicate acts."). Plaintiff in the instant case has methodically and artfully pled that her injury was proximately caused by a RICO predicate act. However, this assertion is no more than an unsubstantiated legal conclusion. This Court, like the court in *Haviland*, is disturbed by, and wholly rejects the notion that a plaintiff may alter the contours of a proximate causation or standing analysis merely by adding or removing legal labels. If this were true, *Sedima's* rigorous standing requirements would be facilely eroded by skillfully drafted pleadings, and defendants would be lia-

ble to every person injured by their non-RICO conduct. By way of example, the Court points to cases like *Cullom, Hecht, Nodine,* and *Miranda*, where the plaintiffs averred, at least in substance, the same types of extortionate acts as those alleged by Jones. However, in each of these cases, the plaintiffs did not employ a Hobbs Act label, and the courts flatly denied them standing for lack of proximate cause. Given the holdings of these cases, this Court can surmise no adequate legal or policy justification for treating Jones' case any differently. Plaintiff's pleadings may be creative, but they are not capable of altering well-established principles of proximate causation and standing under *Sedima*, nor of eradicating the widespread and unwavering interpretations of these principles in the context of employee discharge cases.

Having determined that Jones' case is identical to other "refusal to cooperate" cases, the Court easily finds that Jones' injury was not proximately caused by a RICO predicate act, and that Jones is therefore not within the class of persons that § 1964(c) was designed to protect. The Fifth Circuit and the Supreme Court have both unequivocally held that an employee discharged for refusing to participate in an illegal activity under RICO lacks standing to sue under § 1964(c). Although firing Jones may have been wrong under the circumstances alleged, and Defendants may be accountable to Jones under theories of wrongful discharge and the like, such conduct is not punishable under RICO. RICO's civil liability provisions were never intended to encompass illegal acts such as retaliatory firings for which there exist appropriate state and common law remedies, and it is from this vantage point that courts have consistently denied standing to wrongfully discharged employees. In light of all of these factors, and

specifically based upon this Court's understanding of the *Cullom* and *Beck* line of cases, and RICO's proximate causation requirement as enunciated in *Sedima*, the Court concludes that Jones' injury, under the *specific* circumstances alleged here, was not a proximate result of Defendants' acts of Hobbs Act extortion, and that Jones consequently lacks standing to bring a cause of action under § 1964(c).[4] The Court accordingly hereby **DISMISSES WITH PREJUDICE** any and all of Plaintiff's RICO claims premised upon Defendants' acts of attempted extortion in violation of the Hobbs Act. In rendering this judgment, the Court emphasizes that Plaintiff's claims for wrongful termination, sex discrimination, pregnancy discrimination, sexual harassment, retaliation, and intentional infliction of emotional distress, still remain intact, subject to further pleadings and analysis. Furthermore, recognizing that a determination of the proximate cause of an injury inherently involves and intrudes upon important policy considerations, and that immediate appeal of this decision may be crucial to the ultimate termination of this litigation, the Court concurrently enters a Partial Final Judgment on the issues treated herein, and expressly invites Plaintiff to seek either direct appeal, or certification for an interlocutory appeal of this Order, which this Court will be pleased to authorize. In order to accommodate such, the matter is stayed for thirty (30) days to give Plaintiff time to consider appellate options. If she elects to appeal, the Court will extend the stay as may be necessary.

## IV. CONCLUSION

For all of the reasons stated above, the Court hereby **GRANTS** Defendant's Motion to Dismiss Plaintiff's RICO Claims, and hereby **DISMISSES WITH PREJUDICE** any and all of Plaintiff's RICO claims *only*, on the specific ground that Plaintiff lacks standing to assert these actions under 18 U.S.C. § 1964(c). Any and all other causes of action brought by Plaintiff remain intact, and remain pending, subject to further Order of the Court. The Court further invites Plaintiff to pursue appeal, or to request certification for an interlocutory appeal of this Order, for which this Court will issue the required certification. Each Party is to bear its own taxable costs incurred herein to date.

**IT IS SO ORDERED**.

---

4. In finding that Jones lacks standing to bring claims under RICO under these *specific* circumstances, however, the Court is not concomitantly holding that a wrongfully discharged employee may *never* recover under RICO. Instead, this Court embraces the sensible statement in *Mruz* that "the fact that racketeering activity under RICO results in job loss does not transmogrify the racketeering into something else." 991 F.Supp. at 712–13. However, the Court is also keenly aware that cases like *Cullom* and *Beck* have severely circumscribed the possibility that a plaintiff may sue under RICO for being terminated for refusing to participate in a RICO prohibitive activity. For such a claim to be successful, an employee would have to demonstrate that an employer had formulated a scheme specifically purposed at facilitating his termination, thereby satisfying RICO's proximate causation requirement. While the occurrence of such a scenario may be rare, it is certainly not impossible. Thus, this Court does not decide today that an employee discharged for refusing to participate in a RICO scheme may never have standing to sue under § 1964(c).